**THE PANTRY, INC., Plaintiff,**

v.

**STOP–N–GO FOODS, INC., and Tri-state Stop–N–Go, Inc., Defendants.**

**No. IP 88–1345–C.**

United States District Court, S.D. Indiana, Indianapolis Division.

Oct. 22, 1991.

William C. Barnard, Frank J. DeVeau, Donald C. Biggs, Sommer & Barnard, P.C., Indianapolis, Ind., for plaintiff.

Robert F. Wagner, R. Robert Stommel, Lewis Bowman St. Clair & Wagner, Indianapolis, Ind., for defendants.

MEMORANDUM ENTRY DISCUSSING COURT'S DISPOSITION OF DEFENDANTS' MOTIONS TO DISMISS COUNTS III, IV AND V OF PLAINTIFF'S AMENDED COMPLAINT

TINDER, District Judge.

Each of the matters discussed below is before the court on defendants' motions to dismiss, filed May 30, 1989 and August 5, 1991.

### I. *Motion to Dismiss Count III*

Count I of plaintiff's complaint states a claim for damages resulting from defendants' breach of a purchase agreement. Count III, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 (Supp. 1990) (the "Act"), requests a declaratory judgment that the defendants breached the purchase agreement. Defendants move the court to dismiss count III because they argue the declaratory judgment claim is inappropriately raised given the remedy provided by the breach of contract claim.

Although the Act allows a party to request declaratory relief and other relief in the same action, the court may use its discretion to determine whether declaratory relief is "appropriate" when other adequate remedies are available. Fed.R.Civ.P. 57. When declaratory relief and another remedy are substantially similar, the court may exercise its discretion to dismiss the declaratory judgment claim. *Newton v. State Farm Fire & Casualty Co.*, 138 F.R.D. 76 (E.D.Va.1991).

The *Newton* court considered an issue similar to that presented in this matter when deciding whether to dismiss plaintiffs' declaratory judgment claim. Plaintiffs claimed that defendant breached their duty under an insurance contract; in addition, plaintiffs requested a declaration of their rights under the insurance policy. The thrust of both claims was that the defendant insurance company owed plaintiffs coverage for their loss. The court reasoned that determination of the breach of contract claim would effectively resolve any questions related to an interpretation of the insurance contract. *Id.* at *77.

Thus, the declaration of rights under the contract was not a legal issue with "sufficient immediacy and reality" to justify continuance of the declaratory judgment portion of the suit. *Id.*

In sum, the court held that the suit presented factual questions more appropriately considered under a breach of contract theory, because declaratory relief would not terminate the dispute as to whether the plaintiff's insurance claim required payment from the defendant. *Id.* Although the superfluous declaratory judgment claim would not cause any material harm, the *Newton* court found that allowing it to "linger" would be unnecessary, would not promote judicial economy, would confuse the issues at trial and promote piecemeal consideration of the issues. *Id.* at n. 5. Given these considerations, the court used its discretion to dismiss the declaratory judgment claim.

■ In this case, the declaratory judgment claim is inappropriately raised because the plaintiff may be fully compensated if it prevails on the breach of contract claim. Plaintiff's argument that the cost of remediation is sufficiently inestimable to require trial of an additional legal theory is unpersuasive. Plaintiff may prove its damages as in any other breach of contract action requiring estimation of future losses. Determination of the breach of contract claim will sufficiently and effectively resolve the issues presented in this matter.

Therefore, defendants' motion to dismiss count III of plaintiff's complaint will be granted.

## II. *Motion to Dismiss Count IV*

■ Count IV of plaintiff's complaint seeks the equitable relief of rescission. Plaintiff claims the parties entered the Purchase Agreement under a mutual mistake and that defendants' material, substantial breach goes to the heart of the parties' agreement. Defendants move to dismiss count IV because defendants claim plaintiff may not request a legal remedy (count I) and an inconsistent equitable remedy (count IV) in the same action.

Defendants' argument contradicts [F.R.C.P.] 8(e)(2) and also mistakes the time at which a party must elect between alternative or inconsistent remedies. Plaintiff has sufficiently stated independent claims for breach of contract and for rescission. Rule 8(e)(2) allows a party to plead alternative theories of relief; therefore, both of these independent claims may be stated in a single complaint. Defendants have cited no authority to support their statement of a "long-settled rule that a claim for an equitable remedy may not be maintained when the plaintiff has an adequate remedy at law." Reply Brief at 6. Of course, at some point both claims cannot be "maintained"; however, that point is not met when the matter is in the pleading stage.

■ When a matter is in the pleading stage, a plaintiff may plead alternative legal and equitable theories of relief because it is unclear which remedy will be supported by the evidence. A party must elect between inconsistent forms of relief when both forms of relief become ripe to choose between them. The axiomatic rule that equitable relief may not be granted when adequate legal relief exists does not affect the viability of either type of claim at the pleading stage. *Media General, Inc. v. Tanner*, 625 F.Supp. 237 (W.D.Tenn.1985) (dismissal of count seeking inconsistent legal and equitable claims due to failure to elect remedy would not be appropriate at pleading stage). Count I and count IV each state claims upon which relief may be granted. Thus, a motion to dismiss count IV on grounds of inconsistency must fail.

## III. *Motion to Dismiss Count V of Amendment Complaint*

After the Indiana Legislature amended an environmental statute during the 1991 General Assembly, plaintiff amended its complaint to add a claim under the new law. Effective July 1, 1991, an amendment to the Underground Storage Tank ("UST") chapter of Indiana's environmental statutes allows a current UST owner to voluntarily clean-up a contaminated site and then seek contribution from the person who owned

the UST at the time the release occurred. Ind.Code Ann. § 13–7–20–21(b) (Burns Supp.1991). In addition, the amendment allows the current owner to recover attorneys' fees arising from the contribution action. Prior to the amendment, the statute allowed a current owner to recover from the prior owner only after the state required the current owner to take a corrective action.

Plaintiff added count V to the complaint, which claims the amendment allows the plaintiff to recover all response costs associated with remediating contaminated sites purchased from the defendant. Defendant moved to dismiss count V for failure to state a claim. Defendant argued that the amendment cannot apply retroactively to create new liability. The petroleum releases at issue occurred prior to the effective date of the amendment; further, plaintiff incurred and claimed response costs prior to the effective date of the amendment. Defendants argue that the amendment does not contain any language indicating that the legislature intended the amendment to apply retroactively; therefore, because Indiana law presumes prospective application of statutes, plaintiff has failed to state a valid claim under the amendment. For the reasons below, defendants' motion to dismiss count V is denied; however, plaintiff's claim under the amendment is limited to response costs and attorneys' fees incurred after the effective date of the amendment.

A. Indiana Law Regarding Retroactive Application of Statutes

■ The analysis below proceeds against a backdrop of statements made by Indiana courts regarding retroactive application of statutes. Indiana law has firmly and consistently held that a statute is presumed to operate prospectively only, unless the statute explicitly states otherwise. *Manns v. State Dept. of Highways,* 541 N.E.2d 929 (Ind.1989); *Gosnell v. Indiana Soft Water Serv., Inc.,* 503 N.E.2d 879 (Ind.1987); *International Fidelity Ins. Co., Inc. v. State,* 567 N.E.2d 1161 (Ind.Ct.App.1991); *Rogers v. R.J. Reynolds Tobacco Co.,* 557 N.E.2d 1045 (Ind.Ct.App.1990); *Bailey v. Menzie,* 505 N.E.2d 126 (Ind.Ct.App.1987). Retroactive application is the exception; laws are applied prospectively absent strong and compelling reasons. *Arthur v. Arthur,* 519 N.E.2d 230, 231 (Ind.Ct.App. 1988), *aff'd,* 531 N.E.2d 477 (Ind.1988).

■ Indiana courts adhere to a strict rule of construction against retroactive operation and will prohibit such unless the legislature's intention to have the statute apply retroactively is unequivocally and unambiguously shown by necessary implication. *Turner v. Town of Speedway,* 528 N.E.2d 858, 863 (Ind.Ct.App.1988). Under certain conditions statutes may be applied retroactively if the legislature so intended but yet failed to indicate in the language.

> A statute must be so construed as to make it effect the purpose for which it was enacted, and if necessary to that end, it will be applied to past as well as to future transactions, although it does not in terms so direct, unless to do so will impair some vested right or violate some constitutional guaranty.

*Connecticut Mut. Life Ins. Co. v. Talbot,* 14 N.E. 586, 589, 113 Ind. 373, 378 (1887); *Standard Accident Ins. Co. v. Miller,* 170 F.2d 495, 497 (7th Cir.1948); *Hiatt v. Howard,* 8 N.E.2d 136, 138, 104 Ind.App. 167, 171 (1937). Thus, Indiana law prohibits impairment of vested rights under any circumstance, yet allows retroactive application of an amendment if it is clear the legislature intended the amendment to operate upon prior conduct.

B. The Amendment

The 1991 amendment to Ind.Code § 13–7–20–21 changed the UST laws to allow a private party to take voluntary corrective action and then seek contribution from the person who owned or operated the UST at the time the release occurred.

> (b) A person who:
>
> (1) Pays to the state the costs described under subsection (a); or
>
> (2) Undertakes corrective action resulting from a release from an underground storage tank, regardless of whether the corrective action is undertaken voluntarily or under an order

issued under section 19 or 20 of this chapter;

shall receive a contribution from a person who owned or operated the underground storage tank at the time the release occurred. A person who brings a successful action to receive a contribution from an owner or operator shall also receive reasonable attorney's fees and court costs from the owner operator.

Ind.Code § 13–7–20–21(b) (Supp.1991). Formerly, a current owner could recover response costs from a third party if (1) the state ordered the current owner to undertake corrective action, and (2) the release was caused solely by the acts or omissions of that third party. The amendment allows a current owner (or any other person) to undertake corrective action voluntarily and then seek contribution. In sum, the amendment removes the intermediate step of a state-issued corrective action order.

Two relevant issues are raised by this amendment. The first issue is whether the amendment applies to releases that occurred prior to the effective date of the statute. If the answer to that question is affirmative, then a second issue is raised: whether a party who undertakes voluntary corrective action may use the amendment to recover response costs incurred prior to the effective date of the amendment, July 1, 1991.

C. Amendment Applies to Any Petroleum Release, Including Releases that Occurred Prior to Effective Date of Amendment

The State of Indiana may require a current owner or operator to remediate a site contaminated by a release that occurred prior to the effective date of the original statute. Public Law 172 of 1987 added Chapter 20 to Indiana's Environmental Management Article; Chapter 20 regulated UST's and gave the Commissioner of the Department of Environmental Management the authority to require an owner or operator to undertake correct action to remediate a release of a regulated substance. Ind.Code § 13–7–20–19 (Supp. 1991).

It is clear from the purpose of the statute that the Commissioner had the authority to order corrective action for releases occurring prior to the effective date of the statute. The statute was intended to identify responsible parties and provide an effective method for the state to remediate *existing* hazardous conditions caused by petroleum releases. The definition of "owner" indicates that the statute was intended to reach back retrospectively to assess liability for prior releases against prior responsible parties. Ind.Code § 13–7–20–4 (Supp.1991) (providing that the "owner" of a UST not in use as of November 1, 1984 is considered the "owner" of record). If the statute were to operate prospectively only, then it would have been phrased quite differently. The statute would have been phrased to include only those who create such messes in the future and/or those who acquire such messes in the future, rather than those who "own" them now.

An analogy to interpretations of the federal Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, is apposite because Indiana's UST statutes follow the same remedial principles established by CERCLA. Although CERCLA provisions contain no explicit statement providing retroactive application, it clearly the rule in federal courts that congress intended CERCLA to apply retroactively. *See, e.g., U.S. v. Northeastern Pharmaceutical and Chemical Co., Inc.,* 810 F.2d 726 (8th Cir.1986); *U.S. v. Shell Oil Co.,* 605 F.Supp. 1064 (D.Colo.1985). Indiana's UST laws fill a gap in CERCLA. A petroleum release is not affected by CERCLA, because petroleum does not qualify as a "hazardous substance" under CERCLA. Indiana's UST laws, drafted in the same language and spirit of CERCLA, were intended to provide a mechanism for effectively administering remediation of sites contaminated by petroleum releases.

Given that CERCLA applies retroactively to provide liability for contamination occurring prior to its effective date,

Indiana's UST laws apply retroactively also. Any other construction would completely diminish the effectiveness of the remedial scheme established by environmental laws. Sites contaminated by petroleum releases that occurred prior to 1987 are no less hazardous than more recently contaminated sites. It is illogical to hold that the state does not have the authority to order corrective action if the owner could prove that the land was contaminated prior to 1987. The statute was intended to apply to any site contaminated by petroleum releases, regardless whether the release occurred after the effective date of the statute.

■■ Having held that Indiana UST laws apply retroactively, it is a simple matter to determine that the amendment applies retroactively also. Thus, Ind.Code § 13-7-20-21(b) applies retroactively to allow a person to correct a site contaminated by a pre-enactment release and seek contribution from the person who owned the site at the time of the release. The amendment merely removed a prerequisite to recovery under the former statute; a person may initiate corrective action voluntarily and recover under the statute without the state issuing a prior corrective order. The amendment cured the innocuous situation whereby a private party who voluntarily desired to remediate a site and receive contribution from the responsible party was required to wait for a corrective order prior to beginning remediation.

Nothing in the amendment suggests that it was intended to affect retroactive application of the statute. Whether the clean-up is initiated by the state or a private party, the UST laws apply retroactively to releases occurring prior to the effective date of the statute or the amendment, respectively. No vested right is upset by this construction of the amendment, because the owner of the site at the time of the contamination always faced liability under Ind.Code § 13-7-20-21(a). The amendment merely effects a transfer of the enforcement of the obligation, which obligation had existed in full force prior to the amendment.

Thus, count V of plaintiff's complaint states a viable claim for contribution under Ind.Code § 13-7-20-21(b).

D. Amendment Does Not Apply Retroactively to Allow Recovery of Pre-enactment Response Costs

■■ Although the amended section of Ind.Code § 13-7-20-21 applies to releases occurring prior to the effective date of the amendment, the amendment does not allow recovery of response costs or attorneys' fees incurred prior to the effective date of the amendment.

The amendment allows private parties to recover contribution without intermediate state involvement; therefore, the purpose of the amendment was to encourage private parties to remediate environmental hazards voluntarily. This purpose is not served by allowing a party who had previously incurred response costs to seek contribution against a prior owner. The amendment does not provide an additional theory of recovery to those parties who had previously cleaned-up release sites. Prior to the amendment, those parties were, or should have been, protected by contractual warranties.

Construing the amendment to allow recovery of pre-enactment response costs would not *promote* any future environmental clean-up, because the clean-up producing the pre-enactment costs would have been performed. Instead of promoting environmental clean-up, such a construction would merely provide a windfall recovery for parties who voluntarily effected remediation prior to the amendment. Section 13-7-20-21(b) was intended to effect future remediation of existing or future contamination; the purpose of the amendment was not to provide a remedy for pre-enactment costs incurred voluntarily. Given that the statute and the amendment apply retroactively precisely because the legislature intended them to promote future corrective action, the amendment must apply to pre-enactment response costs only.

## E. Conclusion

Defendants' motion will be granted to the extent that Count V of plaintiff's amended complaint demands contribution for costs incurred prior to the effective date of the amendment; however, defendants' motion will be otherwise denied, because plaintiff has stated a valid claim for contribution of costs incurred after July 1, 1991.

ALL OF WHICH IS ENTERED.

## ON MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff filed an amended five-count complaint against defendants July 11, 1991. Count I of the amended complaint alleged that the defendants breached warranties provided in a Purchase Agreement made between the parties. Plaintiff's motion requests partial summary judgment on the issue of liability, declaring that defendants breached certain warranty provisions in the Purchase Agreement.

## I. *Findings of Fact* [1]

On December 18, 1987, The Pantry, Inc. ("The Pantry") and Stop–N–Go Foods, Inc. and Tri-state Stop–N–Go, Inc. (collectively "Stop–N–Go") executed a Purchase Agreement relating to the sale of sixteen convenience stores (the "properties"). All of these properties have facilities for the retail sale of petroleum products, and are located in the Evansville, Indiana and Henderson, Kentucky areas.

Prior to the closing date, Stop–N–Go employed Losack, Inc. ("Losack") to perform environmental testing at the facilities. Stop–N–Go hired Losack in response to concerns raised by The Pantry regarding the possible presence of subsurface contaminants on the properties. Losack's test results indicated the presence of benzene, toluene, xylene and petroleum hydrocarbons in varying concentrations at each of the properties. *Purchase Agreement*, Appendix A. The Losack report noted that an underground pump operating at a property located in Evansville, Indiana discharged contaminated groundwater into a nearby city sewer. The pump removed groundwater to keep the water level controlled around an improperly anchored underground storage tank ("UST") containing waste oil. Instead of performing their own testing, The Pantry demanded that the Purchase Agreement include certain warranties regarding the environmental conditions at the properties. Both parties drafted the language of the environmental warranties.

Article 13 of the Purchase Agreement contains the entirety of the warranties, covenants, and other provisions that were agreed to by the parties concerning the environmental condition of the Properties. Article 13 contains the following definition of the term "Environmental Requirements," which is used throughout the article:

> "Environmental Requirements" shall mean: federal, state, county or local statutes, laws, rules, regulations, ordinances, codes, licenses, permits or standards in effect as of the date of execution hereof imposed by any governmental authority having jurisdiction in the matter as of the date of execution hereof, relating to environmental matters, including, by way of illustration and not limitation, the Resource Conservation and Recovery Act, as amended (42 U.S.C. § 6901 *et seq.*) and the Comprehensive Environmental Response, Compensation and Liability Act, as amended (42 U.S.C. § 9601 *et seq.*).

Paragraphs C and D of Article 13 of the Purchase Agreement contain the following warranties of Stop–N–Go (referred to as the "Seller") to The Pantry (referred to as the "Buyer") concerning the Stores (referred to as the "Property"):

> C. As of the date of closing, the real property including leased real property, which is the subject of this Agreement (the "Property"), and such Property's use at the time of closing and

[1]. To the extent that these findings of fact incorporate conclusions of law, or are mixed questions of fact and law, they should be considered as supporting the judgment regardless of the label. A corollary construction should be applied to the portion of the entry entitled "Conclusions of Law."

prior uses by Seller, and to Seller's knowledge any other person, to the best of Seller's knowledge substantially comply and have at all times substantially complied with, and Seller is not in violation of and has not violated, in connection with the ownership, use, maintenance or operation of the Property in the conduct of the business related thereto, Environmental Requirements. Except for the Property suffering the Known Contamination, no corrective action, work, repairs, construction, or other expenditures with respect to the Property is required by Environmental Requirements. Except for the Property suffering the Known Contamination, no hazardous or toxic materials, substances, pollutants, contaminants, or waste have been, by Seller or to Seller's knowledge any other person, to the best of Seller's knowledge released into the environment or deposited, discharged, placed or disposed of at, on, or to Seller's knowledge near the Property at levels requiring any corrective action under Environmental Requirements as defined herein, and the Property has not been used at any time by Seller as a landfill or waste disposal site, and Seller has no knowledge that the Property has been used by any person as such.

D. No notices of any violation of Environmental Requirements relating to the property of its use have been received by Seller. There are no writs, injunctions, decrees, orders or judgments outstanding and no lawsuits, claims, proceedings, or investigations pending or threatened relating to the ownership, use, maintenance or operation of the property, with the exception of the Known Contamination.

With the exception of the Property suffering the Known Contamination, Purchaser accepts the locations, tanks, and dispensing equipment in their present condition and assumes responsibility therefor as of the date of closing hereof, and agrees to hold Seller harmless from any loss, cost, damage or expense arising from or related to the existence of or operation of such gasoline storage tanks and facilities, despite the fact that changes in the Environmental Requirements may occur subsequent to the date of execution hereof, and such changes in the future may dictate action not required at the time of execution hereof, with the exception that in the event that during a period of six (6) months after the closing, corrective action is required as the result of the existence of contamination or lack of tigtness [sic] in tanks or dispensing equipment prior to the closing and delivery of possession hereunder at levels requiring corrective action, pursuant to the Environmental Requirements. Seller shall indemnify and hold Purchaser harmless from any loss, cost, damage or expense, including reasonable attorneys' fees, resulting from and related directly to such necessity for corrective action. Such indemnity shall not relate to consequential or indirect expense or loss such as, by way of illustration and not limitation, interruption of business, loss or revenue or profit, or interference with ingress and egress to the Property, and in the event any action or proceeding is instituted to enforce any obligation hereunder relating to such indemnity, Purchaser shall have the burden of proof to establish that such corrective action is the result of contamination or such lack of tightness existing prior to the date of closing at levels requiring such corrective action pursuant to the Environmental Requirements in place as of the date of closing.

The court considers the undisputed Losack test results as factually accurate. Benzene, toluene, xylene and other petroleum hydrocarbons were present in the test samples of the soil and groundwater at the Properties at or about the time of the closing of the sale in the following concentrations, shown in parts per million. (MW# refers to monitoring well samples of groundwater; B# refers to boring samples of soil; S# refers to particular samples of groundwater or soil from a given monitoring well or soil boring.)

a. 5817 Stringtown Road, Evansville, Indiana

| Sample Number | Benzene | Toluene | Xylene | Total Hydrocarbons |
|---|---|---|---|---|
| B# 1, S# 1 | <0.10 | <0.10 | 0.90 | 9 |
| B# 1, S# 2 | 3.76 | 5.82 | 7.59 | 112 |

b. 410 North Tekoppel Avenue, Evansville, Indiana

| Sample Number | Benzene | Toluene | Xylene | Total Hydrocarbons |
|---|---|---|---|---|
| MW# 1 | 5.25 | 2.99 | 1.79 | 113 |
| MW# 2 | 3.42 | 1.33 | 0.91 | 69 |
| MW# 3 | 9.27 | 8.89 | 7.47 | 145 |
| MW# 4 | 2.79 | 0.23 | 0.15 | 27 |
| MW# 5 | Not available | Not available | Not available | 1,600 |

c. 960 South Weinbach, Evansville, Indiana

| Sample Number | Benzene | Toluene | Xylene | Total Hydrocarbons |
|---|---|---|---|---|
| MW# 1, S# 1 | 12.16 | 11.97 | 7.04 | 200 |
| MW# 2, S# 1 | 0.91 | 3.22 | 0.18 | 70 |
| B# 1, S# 1 | <0.10 | <0.10 | 0.68 | <5 |
| B# 1, S# 2 | <0.10 | 0.30 | 0.13 | 5 |

d. 1650 South Kentucky Avenue, Evansville, Indiana

| Sample Number | Benzene | Toluene | Xylene | Total Hydrocarbons |
|---|---|---|---|---|
| B# 1, S# 1 | 0.76 | 10.01 | 8.36 | 266 |

e. 1704 2nd Street, Henderson, Kentucky

| Sample Number | Benzene | Toluene | Xylene | Total Hydrocarbons |
|---|---|---|---|---|
| B# 1, S# 1 | 0.82 | 24.14 | 1.26 | 229 |
| B# 1, S# 2 | <0.10 | 22.0 | 0.80 | 32 |
| B# 1, S# 3 | <0.10 | 2.68 | 1.87 | 74 |
| B# 2, S# 1 | <0.10 | 1.47 | 0.97 | 41 |
| B# 3, S# 1 | <0.10 | 0.87 | 0.85 | 100 |
| B# 4, S# 1 | 0.38 | 1.51 | 1.70 | 27 |

f. 1415 Bosley Road, Owensboro, Kentucky

| Sample Number | Benzene | Toluene | Xylene | Total Hydrocarbons |
|---|---|---|---|---|
| B# 1, S# 1 | 1.10 | 1.91 | 9.06 | 195 |
| B# 2, S# 1 | 0.40 | 1.52 | 10.10 | 79 |
| B# 2, S# 2 | <0.10 | <0.10 | 0.95 | <5 |
| B# 3, S# 1 | <0.10 | 1.80 | 6.17 | 105 |
| B# 3, S# 2 | <0.10 | <0.10 | 6.17 | 21 |
| B# 3, S# 3 | 0.40 | 0.70 | 1.83 | 25 |
| B# 4, S# 1 | <0.10 | 0.27 | 6.66 | 149 |
| B# 4, S# 2 | 0.70 | 1.65 | 17.90 | 84 |
| B# 5, S# 1 | <0.10 | 2.18 | 10.12 | 126 |
| B# 5, S# 2 | <0.10 | 1.16 | 5.31 | 163 |

g. 600 Breckenridge, Owensboro, Kentucky

| Sample Number | Benzene | Toluene | Xylene | Total Hydrocarbons |
|---|---|---|---|---|
| B# 1, S# 2 | 0.50 | 1.19 | 9.29 | 55 |
| B# 2, S# 1 | 4.00 | 12.22 | 35.62 | 645 |
| B# 3, S# 1 | 0.69 | <0.10 | <0.10 | 80 |
| B# 4, S# 1 | 5.95 | 3.32 | 8.56 | 89 |
| B# 4, S# 2 | 0.39 | 1.17 | 12.33 | 116 |

h. Route 1, Highway 54, Philpot, Kentucky

| Sample Number | Benzene | Toluene | Xylene | Total Hydrocarbons |
|---|---|---|---|---|
| B# 1, S# 1 | <0.10 | <0.10 | <0.10 | 28 |
| B# 1, S# 2 | 0.10 | 0.25 | 0.81 | Not available |
| B# 2, S# 1 | 0.26 | <0.10 | 2.25 | 23 |

i. 1209 South Green Street, Henderson, Kentucky

| Sample Number | Benzene | Toluene | Xylene | Total Hydrocarbons |
|---|---|---|---|---|
| B# 1, S# 1 | 0.18 | 0.23 | 0.18 | 108 |
| B# 2, S# 1 | <0.10 | 0.10 | 0.66 | 6 |
| B# 3, S# 1 | <0.10 | 0.20 | 0.93 | 10 |
| B# 3, S# 2 | 0.36 | 0.28 | 1.03 | 12 |
| B# 4, S# 1 | <0.10 | 0.13 | <0.10 | 82 |
| B# 5, S# 1 | .18 | 2.15 | 10.29 | 103 |
| B# 5, S# 2 | <0.10 | 0.24 | 0.57 | 8 |
| B# 6, S# 1 | 0.67 | 7.23 | 14.01 | 142 |
| B# 6, S# 2 | <0.10 | 0.66 | 2.03 | 25 |
| B# 7, S# 1 | 0.24 | 1.15 | 3.63 | 60 |
| B# 8, S# 1 | <0.10 | <0.10 | 3.77 | 27 |

The court finds that at the time of the closing of the sale and thereafter until it was discovered by The Pantry, an underground pump at the property located at 410 North Tekoppel Avenue in Evansville, Indiana discharged groundwater into the local sewer system. The discharged water contained benzene, toluene, xylene and other petroleum hydrocarbons in the following concentrations:

| Benzene | Toluene | Xylene | Total Hydrocarbons |
|---|---|---|---|
| 9.27 | 8.89 | 7.47 | 145 |

The sewer into which the underground pump discharged contaminated groundwater led to a wastewater treatment plant owned and operated by the City of Evansville, Indiana. Stop–N–Go did not have a pretreatment permit allowing discharge of the contaminated groundwater into the sewer.

After the parties closed the transaction, The Pantry employed the Southern Pump & Tank Company ("SPATCO") to perform further environmental testing at the properties. Substantially confirming the Losack test reports, the SPATCO reports indicated that the properties contained subsurface contaminants, which probably escaped from leaking USTs. SPATCO confirmed that one of the Evansville properties used an underground pump to remove groundwater surrounding a waste oil UST.

On April 5, 1988, The Pantry sent notice to Stop–N–Go that, in the Pantry's opinion, the condition of the properties at the time of closing violated the environmental warranties. Stop–N–Go disagreed. The Pantry contacted the Indiana Department of Environmental Management ("IDEM") and the Kentucky Department of Environmental Protection ("KDEP") to inform those agencies of the test results. On October 28, 1988 the KDEP required The Pantry to perform soil and groundwater sampling at

five Kentucky properties. On March 31, 1989, the IDEM required The Pantry to conduct sampling and submit other data concerning one of the Indiana properties. The notice stated that further requests would follow for similar information concerning the other Indiana properties. The March 31, 1989 notice was the first order from the IDEM concerning any of the Indiana properties.

The Pantry's complaint made a number of claims against Stop–N–Go arising from the discovery of contamination at the properties. This Motion for Partial Summary Judgment requests judgment declaring that the condition of the properties and Stop–N–Go's use of the properties violated the environmental warranties provided by Stop–N–Go in the Purchase Agreement.

## II. *Conclusions of Law and Discussion*

### A. Standard of Review for Summary Judgment Motion

■ The standard the court applies to resolve a motion for summary judgment is well established and will be stated summarily. The plaintiff is entitled to summary judgment if,

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). Summary judgment, pursuant to Federal Rule of Civil Procedure 56, is properly granted only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In making this determination, this court views the record in the light most favorable to the party opposing the motion. *See Morgan v. Harris Trust & Sav. Bank*, 867 F.2d 1023, 1026 (7th Cir.1989) (per curiam). The moving party has the initial burden of demonstrating that absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. at 2552–53. The non-moving

party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). "[A]t the summary judgment stage the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. at 2511.

■ A court must enter summary judgment against the non-moving party if, after adequate time for discovery, the party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23, 106 S.Ct. at 2552. A party opposing summary judgment has the burden of producing some evidence to that effect, and may not rest merely on its own allegations. *Anderson*, 477 U.S. 242, 106 S.Ct. 2505. Furthermore, a factual dispute must be outcome determinative to preclude summary judgment. *Donald v. Polk County*, 836 F.2d 376, 379 (7th Cir.1988). Thus, the mere assertion of a factual dispute cannot defeat the motion for summary judgment. *Anderson*, 477 U.S. 242, 106 S.Ct. 2505.

■ This motion raises an issue regarding the proper method to construe contractual clauses at the summary judgment stage. Whether or not a contract is ambiguous is a question of law, not of fact. *Air Line Stewards v. American Airlines, Inc.*, 763 F.2d 875 (7th Cir.1985). An ambiguity is not established by the mere fact the parties assert different interpretations of a contract. *Ethyl Corp. v. Forcum–Lannom Assoc., Inc.*, 433 N.E.2d 1214 (Ind. App.1982).

### B. Construction of Warranty Provisions

■ This summary judgment motion requires the court to determine the proper

scope and operation of certain warranties contained in the Purchase Agreement (hereafter called "Environmental Warranties").[2] In giving effect to these Environmental Warranties, the court considers the warranty language as a whole; each individual statement must be considered in the framework of the entire section. *Ahlborn v. City of Hammond*, 232 Ind. 12, 111 N.E.2d 70 (1953); *Seibert v. Mock*, 510 N.E.2d 1373 (Ind.App.1987) (duty of court to interpret contract as harmonized whole to determine intent of the parties). Intention of parties and construction of contract must be determined by viewing contract as a whole and not from isolated parts of fragments. *McClain's Estate v. McClain*, 133 Ind.App. 645, 183 N.E.2d 842 (1962). The language is given its plain ordinary meaning, unless it is sufficiently ambiguous to require recourse to a determination of the parties' intent in executing it. *In re Krause*, 114 B.R. 582 (Bankr.N.D.Ind. 1988); *Evansville–Vandenburgh School Corp. v. Moll*, 264 Ind. 356, 344 N.E.2d 831 (1976). Upon these principles, the Environmental Warranties are evaluated below.

The Environmental Warranties provide six separate statements warranting the properties. These warranty statements may be separated and numbered as follows:

1. As of the date of closing, to the best of Stop–N–Go's knowledge, the properties substantially complied with the Environmental Requirements;

2. To the best of Stop–N–Go's knowledge, Stop–N–Go's use of the property and any other person's use of the property substantially complied with the Environmental Requirements;

3. Stop–N–Go is not in violation of and has not violated the Environmental Requirements in connection with the ownership, use, maintenance or operation of the properties;

4. No corrective action, work, repairs, construction, or other expenditures with respect to the properties is required by the Environmental Requirements;

5. To best of Stop–N–Go's knowledge, no contaminants, pollutants or other substances have been released into the environment or deposited, discharged, placed or disposed of at, on, or near the properties at a level requiring any corrective action under the Environmental Requirements;

6. If, within six months after the closing of the transaction, the Environmental Requirements require corrective action as the result of pre-closing contamination or lack of tightness in the tanks or dispensing equipment, then Stop–N–Go will indemnify The Pantry against expenditures, notwithstanding that the corrective action is required because of a change in the Environmental Requirements.

■ Both parties agree that no administrative agency actually ordered any corrective action to be performed on the properties prior to the date of closing. Further, both parties agree that no corrective action was ordered within six months after the closing. Thus, the first issue is whether the Environmental Warranties are limited to warranting against actual notices of violation and corrective orders only. The warranties are not so limited. The Environmental Warranties warranted that, at the closing, the properties did not contain a level of any substance that *would* be in violation of, or require corrective action under, existing law—regardless whether such corrective action was actually ordered or not.

■ Each of the warranty statements dependent upon "Seller's knowledge" of a violation or condition or dependent upon "substantial compliance" potentially raises an issue of fact. As numbered above, warranties one, two and five raise such issues and are not ripe for summary judgment. However, warranties three, four and six do not depend upon either of those conditions, but rather make definite statements warranting the environmental condition of the properties. When taken together, even in light of the other language, the latter three warranties provide an ample basis upon which to find that Stop–N–Go warranted that the properties complied with environ-

**2.** The text of the Environmental Warranties (article 13 of the Purchase Agreement) is set forth in the previous section regarding findings of fact.

mental laws in effect at the time of closing. The most reasonable and harmonious reading gives effect to each clear warranty statement in light of the purpose of the other statements. Given the purpose and phrasing of the warranties, it is clear Stop–N–Go made definite warranties, which were not premised upon their "knowledge" or "substantial" compliance.

■ Warranty number three warrants that Stop–N–Go is not in violation of and has not violated the Environmental Requirements in connection with the ownership, use, maintenance or operation of the properties. Warranties four and six restate warranty three in terms of whether corrective action is required as the result of existing contamination. The three warranties are of virtually the same effect because Stop–N–Go would "violate" the Environmental Requirements by failing to perform a "corrective action" demanded by those same Environmental Requirements. If the properties contained an amount of contaminants greater than that allowed by the Environmental Requirements, then the properties "required corrective action." Any condition that required corrective action at closing constitutes a breach of warranty.

Thus, Stop–N–Go is in breach of warranty as a matter of law if the undisputed facts indicted that the presence or concentration of any substance on any property violated an Environmental Requirement.[3] Warranty number three applies directly to the discharge from the pump that maintained the improperly anchored UST. If the use of the pump violated a local ordinance or other law, then Stop–N–Go's "use" of that property violated an Environmental Requirement.

C. Discussion of Undisputed Facts Regarding Condition of the Properties at Closing

1. *Presence of Benzene, Toluene, Xylene and Total Hydrocarbons*

Neither party disputes the accuracy of the Losack test results. Losack took monitoring well samples of groundwater and bore soil samples. In answer to requests for admission, defendants admitted that Losack was competent to perform the tests and that Losack actually performed the tests. *Defendants' Responses to Plaintiff's Requests for Admission,* at 2. Defendants admitted that the data accurately reflect the amounts of benzene, toluene, xylene and total hydrocarbons present at the site of each store, to the extent that the data reflect the amount present in each sample. *Id.* at 2–12. Based upon these admissions, the court concludes that there is no genuine issue of fact regarding whether some of the soil and groundwater at the respective properties contained the amount of substances listed in the table found in the findings of fact section.

2. *Unpermitted Discharge of Untreated Wastewater Into Evansville Sewer System*

■ The Pantry alleged that an underground pump operating at the store located at 410 North Tekoppel Avenue, Evansville, Indiana, discharged wastewater without a permit in violation of a local ordinance. While carefully avoiding any statement that the pump did not operate, defendants argue that plaintiff's original motion provided "no evidence from any witness that the pump was actually functioning and discharging anything." *Defendants' Brief in Opposition to Partial Summary Judgment,* at 22. Plaintiff provided sufficient facts to allow this court to conclude that there was a pump at the store and that the pump was discharging wastewater without a permit.

The fact that the pump was actually operating was documented by Losack in a report included as Exhibit B to the Purchase Agreement. "One of the 'monitoring wells' apparently is being pumped continuously to remove groundwater from the tank hole due to the tank not being adequately anchored." *Purchase Agreement,*

---

**3.** See section II(D)(2)(b) of this Entry for a detailed discussion of the scope of the warranties established by paragraphs 13(C) and (D).

Exhibit B, at 140. In addition, Stop–N–Go admitted by a letter to The Pantry dated April 20, 1988 that the pump was operating. "It is [our] understanding that the discharge of water into the storm sewer was approved by the local authorities having jurisdiction in the matter." This letter has been authenticated by affidavit.

Given that Fed.R.Civ.P. 56(e) requires a party to produce some evidence to raise a genuine issue of fact, and that Stop–N–Go has made unsupported allegations only, there is no genuine dispute as to whether groundwater was pumped into the sewer. Defendants' have proffered no evidence to raise an issue of fact whether the "storm sewer" was a sewer within the jurisdiction of the City of Evansville. Finally, no evidence has been provided that Stop–N–Go had a permit to discharge water into the city sewer system.

> D. Violations of Applicable Environmental Requirements

The final issue presented by this motion is whether the condition or use of the properties at the time of closing violated applicable Environmental Requirements.

> 1. *Kentucky Statutes and Regulations*

Kentucky has a general purpose statute defining "hazardous substances" and providing when a responsible party must take action to restore the environment after a discharge of these substances. Ky.Rev. Stat. § 224.877 (Michie/Bobbs–Merrill 1990). The statute defines a "hazardous substance" as

> any substance or combination of substances including wastes of a solid, liquid, gaseous or semi-solid form which, because of its quantity, concentration or physical, chemical or infectious characteristics may cause or significantly contribute to an increase in mortality or an increase in serious irreversible or incapacitating reversible illness, or pose a substantial present or potential hazard to human health or the environment. Such

substances may include but are not limited to those which are, according to criteria established by the cabinet, toxic, corrosive, ignitable, irritants, strong sensitizers or explosive.

Ky.Rev.Stat.Ann. § 224.877(1)(b).[4] The statute provides that "Persons possessing or controlling a hazardous substance being discharged or who caused the discharge shall take the actions necessary to restore the environment to the extent practicable and minimize the harmful effects from any discharge into the air, lands or waters of the Commonwealth." Ky.Rev.Stat. § 224.-877(4).

After stating the broad definition of "hazardous substance," the statute provides that

> The cabinet shall promulgate regulations designating the hazardous substances subject to the provisions of the section, provided that the regulations shall not designate as hazardous any substance that is not a hazardous substance under the federal Comprehensive Environmental Response Compensation and Liability Act.

Ky.Rev.Stat.Ann. § 224.877(2). The cabinet has not promulgated any regulations further designating "hazardous" substances subject to the statute. Defendants contend that the KDEP cannot implement § 224.877(4) because of the cabinet's failure to designate substances, as specifically required by § 224.877(2). *Brief in Opposition to Motion for Partial Summary Judgment*, at 11. The Pantry submitted deposition testimony that, under the apparent authority of § 224.877(4), the KDEP requires clean-up of "any contamination at all" in the soil. *Haight Dep.*, at 23–25.[5] That is, the KDEP would require clean-up of a service station until the concentration of contaminants reaches a non-detectable "background" level. *Id.* Plaintiff argues that this internal, unpublished KDEP "enforcement standard" provides a sufficient basis to conclude that the conditions of the

---

**4.** The first sentence of this definition is identical to the definition of "hazardous waste" provided by Ind.Code § 13–7–1–12 (1990).

**5.** Ms. Haight was the Assistant Director of the Division of Waste Management of the KDEP at the time of closing.

Kentucky properties violates § 224.877. Defendants contend that this "internal guideline" is irrelevant and that the statute is unenforceable because the cabinet failed to "promulgate regulations designating the hazardous substances subject to the provisions of this section," as required by § 224.877(2).

When a statute provides a vague, broad definition of a term and then specifically provides that an administrative body *shall* "promulgate regulations designating the [items] subject to the [statute]," the administrative body must promulgate the required regulations for the statute to have effect. The statute provides that the cabinet "shall" promulgate regulations; this is a mandatory requirement and not an enabling provision allowing the body to further define the term as they deem necessary. Moreover, the statute requires that the regulations "designate the substances subject to the [the statute]." This language plainly signals that a substance must be "designated" by the cabinet to be subject to the statute. The statute and regulations would be dependent and not merely complementary.

The Purchase Agreement provides that " 'Environmental Requirements' shall mean: federal, state, county or local statutes, laws, rules, regulations, ordinances, codes, licenses, permits or standards in effect as of the date of execution hereof imposed by any governmental authority having jurisdiction in the matter as of the date of execution hereof, relating to environmental matters...." *Purchase Agreement*, ¶ 13(C). Given that the cabinet had not promulgated regulations designating any substances subject to the statute, the statute is of no legal "effect." Thus, § 224.877 is not an "Environmental Requirement" as the term is defined in the Purchase Agreement.

Kentucky statutes specifically provide that the KDEP's internal guidelines are unenforceable. Ken.Rev.Stat.Ann. §§ 13A.120 and 13A.130 (Michie/Bobbs–Merrill 1990). Even if the KDEP internal guidelines specifically designated "substances" considered hazardous (which they do not), the internal guidelines would be void and unenforceable. Kentucky's administrative regulations provide that "No administrative body shall issue standards or by any other name issue a document of any type where an administrative regulation is require or authorized by law." Ken. Rev.Stat.Ann. § 13A.120(4). In addition, the statutes provide that some matters are prohibited as a subject of internal policy. "An administrative body shall not by internal policy, memorandum, or other form of action ... [e]xpand upon or limit a statute or administrative regulation.... Any administrative body memorandum, internal policy, or other form of action violative of this section or the spirit thereof is null, void, and unenforceable." Ken.Rev.Stat. Ann. §§ 13A.130(b) & (c)(2). Thus, the internal guidelines can neither supplement § 224.877(2) nor define a hazardous substance by their own force.

It may be that the presence of any benzene, toluene and xylene at a site indicates a "contaminated" condition, because those substances would not be present without a petroleum release. However, the issue here is strictly whether the undisputed level of the substances violated any valid Kentucky laws *in effect* at the time of closing. Aside from § 224.877, plaintiff has cited no Kentucky statutes or rules allegedly violated by Stop–N–Go at the time of closing. Given that the only statute cited by plaintiff is of no effect, no Kentucky property violated an Environmental Requirement based upon Kentucky law.[6]

---

**6.** The KDEP issued a Notice of Violation to Stop–N–Go and The Pantry on April 24, 1989 for "[f]ailure to take remedial measures" pursuant to § 224.877(4). Of course, this Notice is of no weight, because the underlying statute was not in effect at the time the KDEP issued the Notice. The KDEP does not have authority to issue such a Notice because no valid statute provides such authority. Further, even if it were possible that the KDEP had "independent" authority to determine violations, such action would not be a breach of the Environmental Warranties. The Environmental Warranties do not warrant that no administrative agency would determine that corrective action is required; rather, they warrant that no statute, regulation, rule, etc. required any corrective action.

### 2. *Indiana Statutes and Regulations*

#### a. Prohibition against contributing to a polluted condition

Indiana law proscribes certain activities that contribute to "polluted conditions" of State "waters":

It is unlawful for any person to throw, run, drain, or otherwise dispose into any of the streams or waters of this state ... any organic or inorganic matter that shall cause or contribute to a polluted condition of any waters, according to any rule of the board under section 7 [§ 13-1-3-7] of this chapter determining what constitutes a polluted condition of any waters that shall be deleterious to the public health....

Ind.Code § 13-1-3-8 (1990). The term "waters" includes groundwater accumulated under the Indiana properties. Ind.Code § 13-7-1-27 (1990). The statute provides the Water Pollution Control Board with the authority to determine what qualities and properties of water shall indicate a polluted condition; these rules must be adopted formally pursuant to Ind.Code § 4-22-2 et seq. Ind.Code § 13-1-3-7 (1990).

The Indiana Code provides the administrative procedures that must be followed for administrative agencies to promulgate effective regulations. A "rule" includes any agency statement of general applicability that is designed to have the effect of law and implements, interprets, or prescribes law or policy. Ind.Code § 4-22-2-3(b) (1990). The requirements of the administrative procedures apply to the Department of Environmental Management and the Water Pollution Control Board. Ind.Code § 4-22-2-13(a) (Supp.1991). If a state agency wishes to promulgate an enforceable "rule," the agency must (1) notify the public of a public hearing regarding the proposed rule, Ind.Code § 4-22-2-24; (2) convene a public hearing on the proposed rule, Ind.Code § 4-22-2-26; (3) consider comments raised at the public hearing, Ind. Code § 4-22-2-27; (4) adopt the rule or revise and adopt the rule, Ind.Code § 4-22-

1-29; (5) submit the rule to the attorney general for review of legality, Ind.Code § 4-22-2-32; (6) submit the rule to the governor, Ind.Code § 4-22-2-33; and, (7) submit the rule to the secretary of state for filing, Ind.Code § 4-22-2-35. A rule is not effective until all of the seven steps are completed. Ind.Code § 4-22-2-36(4). In no case is a rule effective until thirty days after it has been filed with the secretary of state. Ind.Code § 4-22-2-36(2).

■ Plaintiff argues that the IDEM has developed various "enforcement standards" to determine whether corrective action is required to remediate a "polluted condition" under § 13-1-3-8. According to an affidavit filed by plaintiff, the IDEM used the following baseline figures to determine whether corrective action was required under Indiana law: total hydrocarbons in soil at concentrations in excess of 100 PPM; contaminant levels in groundwater in excess of U.S. EPA's MCLs,[7] recommended MCLs, or health advisory levels. *Wagner Affidavit*, ¶ 5.[8] Although these internal unpublished figures may be used by the IDEM, they are not within the definition of "Environmental Requirements" as the term is used in the Purchase Agreement. The internal guidelines cannot be considered "in effect" at the time of closing, because they were not valid rules promulgated according to the procedures of Ind.Code § 4-22-2 et seq. In sum, the guidelines are not part of and cannot help define the Environmental Requirements because the guidelines are not of legal effect and were therefore not "in effect" at the closing.

■ Moreover, the IDEM's unpublished, internal guidelines are not "standards" as the term is used in the Environmental Requirements definition. Plaintiff attempts to make the guidelines "standards" by labelling them "enforcement standards" in its legal arguments. This court interprets the term "standards" to mean valid, enforceable rules as promul-

---

7. "MCL" means minimum concentration level.

8. The affidavit was given by David M. Wagner, who was the Deputy Commissioner of the IDEM at the time of the closing.

gated by appropriate government agencies. Standards must have the force of law; examples are mandatory health standards and other properly promulgated specific, numerical interpretations of statutory language.[9] The obvious purpose of Indiana's administrative procedure laws is to avoid the surprise application of unpublished, internal guidelines that ostensibly interpret the law. Although administrative agencies are charged with interpreting and applying law, their interpretation must be developed and made known according to Ind.Code § 4–22–2 et seq. to have the effect of law.

Given the definition of Environmental Requirements, Stop–N–Go had no reason to believe that it was warranting the condition of the properties against violation of anything beyond the statutes, rules and regulations validly in effect at the time of closing. If the parties meant for unpublished, internal guidelines to be considered in assessing the Environmental Requirements, then they could have written that language into the definition. If the statute or a validly promulgated rule provided the figures used in the IDEM enforcement guidelines, then the condition of the properties would violate a statute or rule "in effect" at the time of closing. Because the IDEM's internal guidelines do not have the force and effect of law, they are outside the scope of the Environmental Requirements and do not assist in determining whether the condition of the properties violated any valid law.

The condition of the Indiana properties may have violated Ind.Code § 13–1–3–8, notwithstanding the ineffective guidelines. The IDEM has promulgated two different types of regulatory standards for determining whether a discharge "contributed to a polluted condition." The first set of regulations determines whether a discharge contributes to a polluted condition based upon the carcinogenicity and concentration of the substances being discharged. Ind.Admin.Code tit. 327, r. 2–1–6(a)(2) (1988). A second set of regulations re-

quires clean-up of an unexpected or unauthorized spill of oil or other hazardous substance. Ind.Admin.Code tit. 327, r. 2–6–1 (1988). Both of these regulations are applied to the undisputed facts of this case.

i. *Polluted condition defined by carcinogenicity and concentration of substances present*

A large body of rules promulgated by the Water Pollution Control Board became effective on October 26, 1987—less than two months prior to the closing. The bulk of the rules established water quality standards applicable to all "waters of the state." Ind.Admin.Code tit. 327, r. 2–1–1 (1988). As in the statutory definition, the "waters of the state" include accumulations of groundwater. Ind.Admin.Code tit. 327, r. 2–1–9 (1988). The water quality regulation applicable to the groundwater at the Indiana properties provides:

At all times, all waters outside of mixing zones shall be free of substances in concentrations which on the basis of available scientific data are believed to be sufficient to injure, be chronically toxic to, or be carcinogenic, mutagenic, or teratogenic to humans, animals, aquatic life, or plants.

Ind.Admin.Code tit. 327, r. 2–1–6(a)(2) (1991). This regulation applies to all water in the state, regardless of its intended use.

In essence, the regulation requires that groundwater be kept free of substances in concentrations which are known to cause cancer. A person who discharges substances in such concentrations violates Ind. Code § 13–1–3–8 because the discharge "contributes to a polluted condition." The issue, then, is whether the benzene, toluene, xylene and other petroleum hydrocarbons at the Indiana properties were present in concentrations which are "believed to sufficient to injure, be chronically toxic to, or be carcinogenic, mutagenic, or teratogenic to humans, animals, aquatic life, or plants." Ind.Admin.Code tit. 327, r. 2–1–6(a)(2).

---

9. Although not determinative of the meaning of "standard" as used in the Environmental Requirements, the Water Pollution Control Board defines a "standard" to be "a *definite* numerical value or narrative statement *promulgated* by the board to maintain or enhance water quality...." Ind.Admin.Code tit. 327, r. 2–1–9 (1990) (emphasis added).

At the time of closing, therefore, the only standard in effect was the narrative standard provided by Rule 2–1–6(a)(2); the board had promulgated no numerical standards further defining acceptable concentration levels.[10] Plaintiff argues that the internal, unpublished guidelines used by the IDEM provide a correct standard for measuring carcinogenic levels of substances. As explained above, these figures are inapposite because they were neither "standards" nor "in effect" for purposes of the Environmental Requirements definition. This court must determine if a question of fact exists regarding whether there was "scientific data" available at the time of closing to "believe" that the level of substances in the groundwater at the properties was chronically toxic or carcinogenic.

In 1985 the EPA promulgated a series of Recommended Maximum Contaminant Levels ("RMCL") for certain inorganic substances, pursuant to authority given by the Safe Drinking Water Act, 42 U.S.C. § 300f, et seq. (1988). 42 C.F.R. § 141.50 (1990). The EPA has divided contaminants into five categories, based upon evidence of their carcinogenicity. The EPA classified benzene as a Category I substance, which is a substance that is a "known or probable human carcinogen" based upon "strong" evidence of carcinogenicity from epidemiological studies. National Primary Drinking Water Regulations; Volatile Synthetic Organic Chemicals, 50 Fed.Reg. 46,880, 46,885 (1985). The EPA derived the classification from "a qualitative review of all available evidence," and determined that benzene is a "known human carcinogen." Id. at 46,-884. The regulations set the RMCL at zero for Category I substances (42 C.F.R. § 141.50), because the EPA believed ingestion of any concentration of the chemical was carcinogenic. Id. at 46,888.

Although the EPA data were gathered for purposes of establishing RMCLs for drinking water and not groundwater, the discussion of the scientific data indicating benzene's carcinogenicity is independent of the standards set for drinking water. Placement in EPA Category I reflects the EPA's conclusion that benzene, in itself, is a known human carcinogen in any concentration. The carcinogenicity and toxic nature of benzene is unchallenged by reputable scientific data. Given these facts, the court takes judicial notice pursuant to Federal Rule of Evidence 201(b) of the fact that benzene is a known human carcinogen.

Federal Rule of Evidence 201(f) allows a court to take judicial notice of adjudicative facts "at any stage of a proceeding"; therefore, judicial notice may be taken when considering a motion for summary judgment. Dickinson v. Indiana State Election Bd., 740 F.Supp. 1376 (S.D.Ind.1990); Implement Service, Inc. v. Tecumseh Prod. Co., 726 F.Supp. 1171 (S.D.Ind.1989). A judicially noticed fact must be one not subject to reasonable dispute; such a fact may be capable of accurate and ready determination by resort to sources whose accuracy cannot reasonable be questioned. Fed.R.Evid. 201(b). The data and conclusion relied upon by the United States Environmental Agency and published in an official government publication places the fact that benzene is a known carcinogen beyond reasonable dispute. Absent some reason for mistrust, courts have not hesitated to take judicial notice of agency records and reports. Terrebonne v. Blackburn, 646 F.2d 997, 1000 (5th Cir.1981) (citing Massachusetts v. Westcott, 431 U.S. 322, 323 n. 2, 97 S.Ct. 1755, 1756 n. 2, 52 L.Ed.2d 349 (1977)).

---

10. On February 1, 1990, the Water Pollution Control Board added subsection (b)(3) to Ind.Admin.Code tit. 327, r. 2–1–6; the subsection included a table, which established numerical standards representing acceptable levels of certain substances. The figures were derived from standards published by the United States Environmental Protection Agency ("EPA"). The standard for benzene is .4 parts per million in waters outside of the mixing zone and .0066 parts per million in waters at the point of intake for potable supply. Ind.Admin.Code tit. 327, 2–1–6(a)(3) (1991).

When the board added the table to the water quality standards, it also amended Ind.Admin.Code tit. 327, r. 2–1–7; that section separated the water quality standards for surface water and groundwater. The figures in the table apply to surface water only; the "interim groundwater standards" remained in narrative form.

██ Because Rule 2–1–6(a)(2) proscribes discharge of a substance in a concentration believed to be carcinogenic, and reputable scientific data indicates that a benzene concentration above zero is carcinogenic, this court concludes that any property containing benzene violates Ind.Admin.Code tit. 327, r. 2–1–6(a)(2) and consequently violates Ind.Code § 13–1–3–8. The undisputed Losack test data indicates that each Indiana property contained benzene. The undisputed levels of benzene at the Indiana properties ranged from a low of 0.91 PPM to a high of 12.16 PPM. Thus, the condition of each property violated Indiana law at the time of closing and thereby breached the Environmental Warranties. Whether the presence and concentration of toluene, xylene and total petroleum hydrocarbons on the properties also violated Rule 2–1–6(a)(2) is a question of fact to be determined by reference to scientific data available at the time of closing.

### ii. *Polluted condition resulting from spill of oil or other hazardous substance*

██ Pursuant to the authority given by Ind.Code § 13–1–3–8 to define "polluted conditions," the Water Pollution Control Board promulgated regulations concerning spills of oil or other hazardous substances.

> Any person who owns [a] commercial facility shall, in the event of a spill … of such volume or mass as to cause or threaten to cause damage to the public health, safety or welfare, aquatic biota, animal life, plant life or recreation, domestic, commercial, industrial or agricultural water uses:
>
> (1) Immediately communicate a spill report on said spill to the [IDEM].
>
> . . . .
>
> (4) Either immediately after or during containment required by subsection (b) [sic., subdivision (3)], whichever is most practicable, clean-up said spill or cause the same to be done.

Ind.Admin.Code tit. 327, r. 2–6–2 (1988). The term "spill" is defined to be "any unexpected, unintended, abnormal or unapproved dumping, leakage, drainage, seepage, discharge or other loss of oil, hazardous and/or otherwise objectionable substance which enters or threatens to enter the waters of the state." Ind.Admin.Code tit. 327, r. 2–6–1 (1988). The term "clean-up" means "to take such action as to neutralize, remove, collect … or,; as may be otherwise necessary, affirmatively act so as to most effectively prevent, minimize or mitigate damage or threatened damage to the public health, safety…." *Id.*

While it appears likely that there have been "spills" on some of the properties prior to the closing date, it is unclear whether the spills were of "such volume or mass as to cause or threaten to cause damage to the public health, safety or welfare." For the reasons stated above, the concentration levels provided in the IDEM internal guidelines are not determinative of this issue. There is a genuine issue of fact as to whether the volume or mass spilled at the Indiana properties threatened to cause damage. If any spill or accumulation of spills occurring prior to the date of closing was sufficiently massive or voluminous to meet this standard, and Stop–N–Go failed to take the steps required by the rule, then Stop–N–Go breached the Environmental Warranties.

### b. UST exposure assessment as "corrective action"

██ On October 21, 1988 The Pantry met with the IDEM to report formally the results of the tests performed by Losack and SPATCO. In a response dated October 31, 1988, the IDEM required The Pantry to perform further sampling and tests at one of the Indiana properties, pursuant to Ind.Code § 13–7–20–28 (1988). *Id.* The Pantry contends that this exposure assessment order, by itself, is a "corrective action," and therefore the Environmental Warranties were violated when IDEM ordered the exposure assessment. There are two reasons the exposure assessment order did not violate the Environmental Warranties. First, no violation of any environmental statute, regulation or standard is required for the IDEM to order an exposure assessment; thus, the order itself does not indicate that the condition of the property

at closing violated any Indiana environmental law. Second, even if the assessment is itself a "corrective action" under the warranties, it did not breach the warranties because the IDEM ordered the assessment after the contractual limitations period expired for such corrective action.

The Environmental Warranties make a subtle distinction between two different types of "required" corrective actions. The two types of warranties are conditioned on events occurring during two distinct time periods. The warranties in paragraph 13(C) warrant that the *condition* or *use* of the properties did not violate any Environmental Requirements as of the date of closing. A violation of these warranties either exists at the time of closing or it never exists.[11] The warranty in paragraph 13(D) expands the protection offered to The Pantry by warranting against any corrective action *actually required* within six months after closing. A breach of paragraph 13(D) may occur even if the condition of the properties at closing did not violate any Environmental Warranty.[12] Thus, it is possible that an assessment order and follow-up corrective action order may breach paragraph 13(D) only.

An exposure assessment ordered under Ind.Code § 13-7-20-28 is not premised on any finding of a pre-existing violation; the purpose of the assessment is to allow IDEM to determine if there is a violation and what corrective action, if any, is required. Thus, the assessment order itself is no evidence that the condition of the property at closing violated any Environ-

mental Requirement in violation of the warranties contained in paragraph 13(C).

The Pantry argues the environmental assessment order itself constitutes a "corrective action," and therefore breaches the warranties even if it is not premised on an environmental violation existing at the time of closing. This argument fails. Even if the order is a "corrective action," the order came after the limitations period provided in the Purchase Agreement. It is true a corrective action order—even if not premised on a violation existing at closing—may violate paragraph 13(D). However, the plain language of that paragraph established a six-month limitations period within which Stop-N-Go assumed liability for corrective action ordered in accord with the Environmental Requirements:

> [P]urchaser accepts the locations, tanks, and dispensing equipment in their present condition and assumes responsibility therefor as of the date of closing hereof, and agrees to hold Seller harmless from any loss, cost, damage or expense arising from or related to the existence of or operation of such gasoline storage tanks and facilities, despite the fact that changes in the Environmental Requirements may occur subsequent to the date of execution hereof, and such changes in the future may dictate action not required at the time of execution hereof, *with the exception that in the event that during a period of six (6) months after the closing, corrective action is required as the result of the existence of contamination or lack of*

---

**11.** The warranties established by paragraph 13(C) provide three different assurances. They warrant (1) that the presence and concentration of all substances on and discharged from the properties do not violate any environmental water or soil quality standards; (2) that Stop-N-Go's use of the property conformed with all environmental laws (e.g. that no non-permitted uses took place); and, (3) that Stop-N-Go did not violate any environmental law by failing to provide information required by any environmental law. Each of these assurances may be breached only before or at the date of closing, but not thereafter.

**12.** The following is an example of how the warranty provided by paragraph 13(D) may be violated absent a violation of paragraph 13(C).

With or without evidence of any contamination, the IDEM could order an environmental assessment pursuant to Ind.Code § 13-7-20-28. After evaluating the assessment, the commissioner could order corrective action pursuant to Ind. Code § 13-7-20-19(a)(2) if the commissioner determined that "any release" had occurred and that corrective action was necessary. Thus, the release itself may not have violated any soil or water quality standards, and yet the commissioner may still validly require corrective action. This distinction exists because a water quality violation is determined by one standard and corrective action ordered by the commissioner is subject to an undefined (and potentially less stringent) standard.

*tigtness [sic] in tanks or dispensing equipment prior to the closing and delivery of possession hereunder at levels requiring corrective action, pursuant to the Environmental Requirements.*

*Purchase Agreement,* ¶ 13(D) (emphasis added).

To constitute a breach of paragraph 13(D), the corrective action order must have resulted from pre-closing contamination and must have been issued prior to June 22, 1988. Because the order was not issued until October 31, 1988, it does not constitute a breach of the Environmental Warranties. The limitation period is entirely reasonable; without it, Stop–N–Go could conceivably have been liable indefinitely for this kind of investigatory order. Based on the plain language of the Purchase Agreement, no breach occurred when the IDEM issued the order over four months after the limitations period.

c. Evansville wastewater ordinance

 The City of Evansville developed a pretreatment permit system to regulate the discharge of contaminants into the city wastewater treatment plant. City of Evansville Ordinance No. F–84–35 (the "Ordinance"). The permit system was developed in 1984 in conjunction with Section 307 of the Clean Water Act, 33 U.S.C. § 1317 (1990). Section 53.510 of the Ordinance states:

It shall be unlawful for Industrial Wastewater Discharges to discharge sewage, industrial wastes, or other wastes to any sewer within the jurisdiction of the city and/or to the wastewater treatment plant without a permit issued by the city.

Under the definitions provided in the Ordinance, Stop–N–Go violated the Ordinance by discharging water from an underground pump at 410 North Tekoppel Avenue in Evansville into the city sewer system without a permit.

An "Industrial Discharger" is "[a]ny non-residential user who discharges industrial wastewater to the wastewater treatment plant." *Evansville Ordinance,* § 53.100. "Other wastes" is defined to include "oil, tar, chemicals, and all other substances except sewage and industrial wastes." *Id.* The groundwater pumped from the site surrounded a waste oil tank; the Losack tests indicate that the groundwater contained benzene, toluene, xylene and other petroleum hydrocarbons. Thus, the pumping of that groundwater into the sewer system was a discharge of "other wastes" within the meaning of the foregoing provision. "Wastewater" is defined to mean "[i]nfluent to the wastewater treatment plant." *Id.*

Applying the preceding definitions and permit requirement to the Stop–N–Go store at 410 North Tekoppel Road, the operation of the pump without a permit violated the Ordinance. Because Stop–N–Go's use of the property was in violation of this Environmental Requirement, such use constitutes a breach of the Environmental Warranties.

III. *Conclusion*

Given that a number of issues were raised and ruled upon in this motion for partial summary judgment, the court provides below a summary of conclusions relevant to the decision to grant plaintiff's Motion for Partial Summary Judgment in part and deny the motion in part.

Summary judgment on the issue of liability will be granted because, as a matter of law, Stop–N–Go breached the Environmental Warranties in the following two respects:

First, the condition of each of the Indiana properties at the time of closing violated Ind.Code § 13–1–3–8 and Ind.Admin.Code tit. 327, r. 2–1–6(a)(2), because the presence and concentration of benzene on each of these properties constituted a "known carcinogenic substance" according to scientific data available from the United States Environmental Protection Agency; therefore, Stop–N–Go breached the Environmental Warranties in this respect. Second, the unpermitted discharge of contaminated groundwater into a sewer at the property located at 410 North Tekoppel Avenue in Evansville, Indiana violated local ordinances that were in effect at the time of

closing of the sale. Therefore, the court holds that the condition and use of the Indiana properties breached the Environmental Warranties in at least these respects.[13]

Summary judgment on the issue of liability will be denied because, as a matter of law, the condition or use of the Kentucky properties did not breach the Environmental Warranties because the condition or use of the properties did not violate any valid Kentucky law in effect as of the closing.

ALL OF WHICH IS ENTERED.

---

**13.** Of course, there may be other ways in which the condition or use of the Kentucky or Indiana properties violated applicable environmental laws. For example, there is an issue of fact whether spills of oil and other hazardous substances occurred on the Indiana properties in "such volume or mass as to cause or threaten to cause damage to the public health, safety or welfare" in violation of Ind.Admin.Code tit. 327, r. 2–6–2. Further, plaintiff argued only that the condition of the Kentucky properties violated a particular Kentucky law. The court expresses no opinion in this entry regarding whether the condition of either the Kentucky or Indiana properties violated other state or federal laws not presented and argued in this motion.