**COMMISSIONER, INDIANA DEPARTMENT OF ENVIRONMENTAL MANAGEMENT, Plaintiff,**

v.

**BOURBON MINI–MART, INC. and Robert E. Wanemacher, Defendants.**

**Bourbon Mini–Mart, Inc. and Robert E. Wanemacher, Appellants–Third Party Plaintiffs,**

v.

**Gast Fuel and Services, Inc. and Jack Boardman, d/b/a/ Boardman Chevrolet, Appellees–Third Party Defendants.**

No. 50A03–9912–CV–476.

Court of Appeals of Indiana.

Dec. 13, 2000.

Patricia Polis McCrory, Harrison and Moberly, Indianapolis, Indiana, Attorney for Appellants.

Daniel G. Orzeske, Andrew S. Peacock, Goodwin, Orzeske & Stevens, P.C., Indianapolis, Indiana, for Gast Fuel and Services, Inc.

## OPINION

KIRSCH, Judge

Bourbon Mini–Mart, Inc. ("Mini–Mart") and Robert E. Wanemacher ("Wanemacher"), defendants in a cause of action commenced by the Commissioner of the Indiana Department of Environmental Management ("IDEM") and third-party plaintiffs in this case, appeal from a grant of summary judgment in favor of Gast Fuel and Services, Inc. ("Gast") and Jack Boardman, doing business as Boardman Chevrolet ("Boardman").[1] Mini–Mart and Wanemacher raise numerous issues on appeal. We restate and consolidate these issues as follows:

I. Whether in the absence of a contractual or statutory indemnity provision a party found liable for environmental contamination of adjoining property is collaterally estopped from bringing a third party action for indemnity against alleged co-contaminators.

II. Whether the 1991 amendment to the Indiana Underground Storage Tank laws applies retroactively to allow a party found liable for environmental contamination of adjoining property to bring a third-party indemnity action against the owner or operator of the underground storage tank alleged to have contributed to the contamination.

III. Whether Mini–Mart and Wanemacher's third-party action against Gast to recover remediation costs incurred after June 30, 1991 is barred by the statute of limitations.

We affirm in part, reverse in part, and remand for further proceedings in accordance with this opinion.

## FACTS AND PROCEDURAL HISTORY

Mini–Mart is a gasoline station and convenience store located in Bourbon, Indiana that began operation in 1976. As part of its business, Mini–Mart stores gasoline in underground storage tanks ("UST"s). Wanemacher is the owner of the real property on which Mini–Mart is located and a corporate officer of Mini–Mart.

From 1978 until 1997, Gast was the sole supplier of gasoline and other petroleum products to Mini–Mart. Boardman operates a neighboring automobile dealership that, as part of its business, maintains an underground tank for the deposit of waste oil, Freon, gasoline, and other chemicals and compounds that are removed from motor vehicles.

---

1. Boardman did not file a brief for this appeal.

In February 1990, the Workmans and Duffs ("Homeowners"), owners of property adjacent to Mini–Mart, complained to IDEM that there were fumes in their homes. At IDEM's request, Wanemacher had his USTs and the lines leading to the USTs "tightness tested" and determined there was no current leakage. In March 1990, IDEM installed monitoring wells for the purpose of locating contaminants in the groundwater and soil and determining the source of the contaminants.

Air samples from the Homeowners' residences and samples of soil and groundwater from outside the residences revealed a "witches brew of solvents," including petroleum, non-fuel hydrocarbons, and halogenated volatiles. *Record* at 992. IDEM determined that the petroleum contamination "originated from the Bourbon Mini–Mart located at the southeast corner of Center Street and Bourbon Street and/or a former Shell station located at the southwest corner of Center Street and Thompson Street." *Record* at 1014.

During a telephone conversation on March 29, 1990, IDEM project manager Jill Stevens informed Wanemacher that "the gasoline contamination is caused at some point by the [M]ini-[M]art tanks." *Id.* at 1343. Stevens indicated that if Wanemacher would not clean up the contamination, IDEM would perform the clean-up and recover its costs from Wanemacher at a later date. Wanemacher took no action. IDEM then installed an air stripper, soil vapor reduction systems to reduce the vapors in the Homeowners' residences, and a separate pump and treat system to recover the contaminated groundwater from under the Homeowners' residences. These programs were ongoing as of November 30, 1999, the date the trial

court granted summary judgment. *Record* at 1749; *Appellant's Appendix* at 3.

On June 28, 1991, IDEM filed suit against Mini–Mart and Wanemacher. In its complaint IDEM sought, among other things, reimbursement for costs it had incurred to remediate the contamination, reimbursement for ongoing remediation costs, and back-payment for unregistered USTs.[2]

In 1991 and early 1992, the Homeowners each filed a suit against Mini–Mart and Wanemacher alleging nuisance, trespass, and negligence based on petroleum and petroleum vapor contamination. On August 26, 1996, the jury returned a verdict finding Mini–Mart and Wanemacher liable for damages to the Homeowners in the sum of $530,000.[3] *Record* at 749.

On December 10, 1997, Mini–Mart and Wanemacher filed a third-party complaint against Gast, Shell Oil Company ("Shell"), and Unocal alleging that they had caused the contamination. Mini–Mart and Wanemacher later amended the complaint to add Boardman. Shell and Unocal were dismissed from the action on motion of Mini–Mart and Wanemacher and are not parties to this appeal.

On November 30, 1999, the trial court granted summary judgment to both Gast and Boardman.[4] The bases for granting Gast's summary judgment were collateral estoppel and that a six-year statute of limitations applied and had run. Boardman's summary judgment was granted on the same two bases plus the additional ground of laches. Mini–Mart and Wanemacher now appeal.

---

2. The back-payment for unregistered USTs is not at issue in this case.

3. Gast and Union Oil Company of California (also referred to in various documents as Union 76, Uno-Cal 76, Unocal 76, and Unocal) ("Unocal") were also named as defendants in these cases. After the cases were consolidated and before trial, Gast and Unocal settled with the Homeowners and were dismissed from the action. Unocal paid the homeowners $40,000, and Gast paid them $44,000. *Record* at 748.

4. We commend the trial court for its analysis of this complicated case. The thoroughness and clarity of its opinion greatly aided our review.

## DISCUSSION AND DECISION

 The purpose of summary judgment is to end litigation about which there can be no factual dispute and which may be determined as a matter of law. *Foster v. Evergreen Healthcare, Inc.,* 716 N.E.2d 19, 23–24 (Ind.Ct.App.1999), *trans. denied* (2000). When reviewing an entry of summary judgment we apply the same standard as the trial court. *Markley Enterprises, Inc. v. Grover,* 716 N.E.2d 559, 563–64 (Ind.Ct.App.1999). We do not reweigh the evidence, but consider the facts and reasonable inferences drawn there from in the light most favorable to the non-moving party. *Id.* at 564.

 Summary judgment is appropriate only when the evidentiary matter designated by the parties shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Shell Oil Co. v. Lovold Co.,* 705 N.E.2d 981, 984 (Ind.1998); *Markley Enterprises,* 716 N.E.2d at 564. On appeal, we are not confined to the theories used by the trial court in its grant of summary judgment, but may affirm the order on alternate legal theories found in the designated materials. *Mendenhall v. City of Indianapolis,* 717 N.E.2d 1218, 1224 (Ind.Ct.App.1999), *trans. denied* (2000); *Squires v. Utility/Trailers of Indianapolis, Inc.,* 686 N.E.2d 416, 419 (Ind.Ct.App.1997).

## I. Indemnification

In their third-party complaint, as amended, Mini–Mart and Wanemacher alleged:

"10. That Third Party Defendants Uno–Cal 76 and Gast Fuel and Services, Inc. were at all times relevant herein operators of the Bourbon Mini–Mart.

11. As operators of the Bourbon Mini–Mart, Third–Party Defendants Uno–Cal 76 and Gast Fuel and Services, Inc. are liable for any costs incurred by Plaintiff [IDEM] to remediate any contamination caused by a release of petroleum from the Bourbon Mini–Mart, if any such release occurred.

. . .

14. That the substances contained in Boardman's waste oil tank leaked from Boardman's waste oil tank and/or were spilled or otherwise released by Boardman or its agents and contaminated the surrounding property and groundwater.

15. That any contamination of the groundwater and/or property surrounding the Bourbon Mini–Mart is the sole result of releases of waste oil, Freon, gasoline, and other chemicals, halogenated compounds, petroleum products, and other substances from Boardman's waste oil tank or otherwise from Boardman's property and as a direct and proximate result of the acts and/or omissions of Third–Party Defendant Boardman and/or its agents.

16. Third–Party Defendant Boardman is liable for any costs incurred by Plaintiff [IDEM] to remediate any contamination of the groundwater and/or soil surrounding the Bourbon Mini–Mart.

WHEREFORE, Third–Party Plaintiffs, Bourbon Mini–Mart, Inc., and Robert E. Wanemacher, request Judgment against Third Party Defendants, Shell Oil Company, Uno–Cal 76, Gast Fuel and Services, and Jack Boardman, DBA Boardman Chevrolet, for any sum which is recovered by Plaintiff, Commissioner, Indiana Department of Environmental Management, against the Third Party Plaintiffs, Bourbon Mini–Mart, Inc., and Robert E. Wanemacher, for costs, and for all other relief that is proper in the premises."[5]

*Record* at 691–92.

 Indiana Trial Rule 14 allows a defendant in an action to act as a third-

---

**5.** IDEM's complaint alleges that it has a right of reimbursement for the $160,000 remediation costs incurred before July 1, 1991 as well as any ongoing cost to remediate the contamination.

party plaintiff and serve a summons and complaint "upon a person not a party to the action who is or may be liable to [the defendant] for all or part of the plaintiff's claim against him." Ind. Trial Rule 14. The purpose of Trial Rule 14 is to "permit common questions of fact to be determined in one litigation in order to avoid delay between a judgment against a party in one action and a judgment for him in a separate action, and to militate against the possibility of inconsistent results." *City of Elkhart v. Middleton*, 265 Ind. 514, 520, 356 N.E.2d 207, 211 (1976). The essence of the rule derives from the situation in which "the third-party defendant's liability to the original defendant is contingent upon that defendant being held liable to the original plaintiff, where the original plaintiff could not have brought suit directly against the third-party defendants." *Pivarnik v. Northern Indiana Pub. Serv. Co.*, 636 N.E.2d 131, 136, (Ind.1994); *Middleton*, 265 Ind. at 520, 356 N.E.2d at 211.

■ Mini–Mart and Wanemacher's third-party complaint against Gast and Boardman is one for indemnification—i.e., they ask the trial court to find that any costs IDEM is able to recover against them should be paid by Gast and Boardman. In Indiana, an obligation to indemnify arises by contract or statute. *Mullen v. Cogdell*, 643 N.E.2d 390, 400 (Ind.Ct. App.1994), *trans. denied* (1995). In the absence of such an obligation, an action for indemnity "will lie only where a party seeking indemnity is without actual fault but has been compelled to pay damages due to the wrongful conduct of another for which he is constructively liable." *Rotec, Div. of Orbitron, Inc. v. Murray Equip., Inc.*, 626 N.E.2d 533, 535 (Ind.Ct.App. 1993), *trans. denied* (1994); *see also Indianapolis Power & Light Co. v. Brad Snodgrass, Inc.*, 578 N.E.2d 669, 671 (Ind.1991) (party seeking indemnification must be free of fault); *Mullen*, 643 N.E.2d at 400 (party may bring an action for indemnification only if he is without fault). Although the question of indemnity is frequently entangled in cases involving third-party practice, T.R. 14 is not designed to add or subtract from the substantive law. 2 WILLIAM F. HARVEY, INDIANA PRACTICE, RULES OF PROCEDURE ANNOTATED § 14.6 (2d ed. 1987). Therefore, "unless allowed by the substantive law, the rule does *not* permit a claim by one joint tortfeasor against another." *Id.*

■ The Record contains no evidence of any contractual obligation requiring Boardman or Gast to indemnify Mini–Mart or Wanemacher for the payment of the IDEM remediation costs. Similarly, it contains no statutory indemnification claim except that against Gast discussed below. Therefore, in order for Mini–Mart and Wanemacher to proceed against Boardman in a third-party complaint for indemnification, Mini–Mart and Wanemacher would have to be without fault in the contamination. *Mullen*, 643 N.E.2d at 400. Here, because Mini–Mart and Wanemacher were found at fault for the contamination in the action brought by the Homeowners, Mini–Mart and Wanemacher are collaterally estopped from pursuing their indemnity complaint against Boardman.

■ Collateral estoppel bars relitigation of a fact or issue where that fact or issue was necessarily adjudicated in a prior cause of action and the same fact or issue is presented in the subsequent lawsuit. *Shell Oil Co. v. Meyer*, 705 N.E.2d 962, 968 (Ind.1998); *Hayworth v. Schilli Leasing, Inc.*, 669 N.E.2d 165, 167 (Ind. 1996); *Exide Corp. v. Millwright Riggers, Inc.*, 727 N.E.2d 473, 477 (Ind.Ct.App. 2000), *trans. denied*; *Bienz v. Bloom*, 674 N.E.2d 998, 1003–04 (Ind.Ct.App.1996), *trans. denied* (1997). Where issue preclusion applies, the first adjudication will be held conclusive, even if the second is on a different claim. *Slutsky v. Crews*, 713 N.E.2d 288, 291 (Ind.Ct.App.1999) (citing *Sullivan v. American Cas. Co.*, 605 N.E.2d 134, 137 (Ind.1992)); *Bienz*, 674 N.E.2d at 1004. Traditionally, Indiana required identity of parties and mutuality of estoppel before collateral estoppel could be in-

voked.[6] *Slutsky,* 713 N.E.2d at 291. The modern rule dispenses with these concepts and instead requires the court to determine whether the party against whom the prior judgment is pled had a "full and fair opportunity to litigate the issue, and whether it would be otherwise unfair under the circumstances of the particular case to apply collateral estoppel." *Hayworth,* 669 N.E.2d at 167; *Sullivan,* 605 N.E.2d at 138; *Exide Corp.,* 727 N.E.2d at 478; *Slutsky,* 713 N.E.2d at 291.

■ Collateral estoppel can be used offensively or defensively. Under defensive collateral estoppel, as applicable here, a defendant seeks to prevent a plaintiff from asserting a claim that the plaintiff previously litigated and lost. *Exide Corp.,* 727 N.E.2d at 477–78; *Slutsky,* 713 N.E.2d at 291. In the Homeowners suit, Mini–Mart and Wanemacher were sued for negligence, trespass, and nuisance because of the petroleum and vapors found in and around the Homeowners' homes. The Homeowners complaints prayed for hundreds of thousands of dollars in damages. Nothing in the Record suggests that Mini–Mart and Wanemacher did not have a full and fair opportunity to litigate the issue of their liability. The jury found Mini–Mart and Wanemacher liable for the contamination of the Homeowners' property. Under the doctrine of collateral estoppel, Mini–Mart and Wanemacher are precluded from asserting that they were without fault in the contamination and thus cannot now bring a third-party indemnification action against Boardman—an alleged joint tortfeasor. The trial court properly granted summary judgment in favor of Boardman.

## II. The 1991 Amendment to the UST Laws

Having determined that Mini–Mart and Wanemacher have no contractual right of indemnification, we turn to the question whether they have a statutory right to indemnification from Gast under the UST laws, specifically IC 13–7–20–21 (the predecessor to IC 13–23–13–8), because Gast is arguably an "operator."

■ On June 28, 1991, IDEM filed suit against Mini–Mart and Wanemacher pursuant to IC 13–7–20–21. On July 1, 1991, this code section was amended ("1991 amendment"). Prior to the 1991 amendment, an owner or operator of a UST that paid remediation costs could recover those costs from a third party only if: (1) the state ordered the owner or operator to take corrective action; and (2) the petroleum leak was caused *solely* by the acts or omissions of that third party. P.L. 129–1991, SEC. 8; *The Pantry, Inc. v. Stop–N–Go Foods, Inc.,* 777 F.Supp. 713, 720 (S.D.Ind.1991) (applying Indiana law) (emphasis added). The pre-amended laws required that the party seeking to recover costs had to be without fault. Mini–Mart and Wanemacher would therefore be unable to proceed with a third-party action against Gast because they are collaterally estopped by the verdict in the Homeowners' suit from alleging that Gast was the sole cause of the leak.

■ After June 30, 1991, the 1991 amendment changed the UST laws to allow a person who voluntarily cleans up a contaminated site or pays remediation costs to seek contribution from a third party if the person can prove that the third party owned or *operated* the UST at the time of the leak.[7] P.L. 129 1991, SEC.

---

**6.** "Identity of the parties" has generally meant that the party to be bound by a prior adjudication must be the same as or in privity with the party in the prior action. *Sullivan,* 605 N.E.2d at 137. The rule of mutuality refers to the requirement that the "one taking advantage of the prior adjudication would have been bound had the prior judgment gone the other way." *Id.*

**7.** The concepts of indemnity and contribution differ in that "contribution involves the partial reimbursement of one who has discharged a common liability while indemnity requires reimbursement of the entire amount of the liability." *Mullen v. Cogdell,* 643 N.E.2d at 400 n. 3 (citing *Coca–Cola Bottling Co.–Goshen, Ind. v. Vendo Co.,* 455 N.E.2d 370, 373 n. 4 (Ind.Ct.App.1983)).

8 (emphasis added). The amendment affected the law in two ways: (1) it removed the requirement that the state order the clean-up; and (2) it removed the requirement that, to seek contribution, the person who paid for the remediation must be faultless in causing the leak. *Id.* Because IDEM ordered the clean-up, only the second change impacts this case.

In their third-party complaint, Mini–Mart and Wanemacher allege that Gast and the other defendants "were at all times relevant herein operators of the Bourbon Mini–Mart"—a status that could create liability. *Record* at 691. Thus, if the amendment applies retroactively and allows one at fault to recover remediation costs incurred before July 1, 1991, the amendment gives Mini–Mart and Wanemacher a statutory right to sue Gast for contribution.

"As a general rule, the law in place at the time an action is commenced governs." *Indiana Dep't of Envtl. Mgmt. v. Medical Disposal Serv., Inc.,* 729 N.E.2d 577, 581 (Ind.2000). Whether a statute or amendment is to be applied retroactively to a pending case depends upon the legislature's intent. *Chesnut v. Roof,* 665 N.E.2d 7, 9 (Ind.Ct.App.1996). Absent an express indication of retroactive application, we presume that the legislature intends statutes and amendments to apply prospectively. *Medical Disposal Serv.,* 729 N.E.2d at 581; *Chesnut,* 665 N.E.2d at 9. Strong and compelling reasons must exist for retroactive application. *Chesnut,* 665 N.E.2d at 9 (citing *Gosnell v. Indiana Soft Water Service,* 503 N.E.2d 879, 880 (Ind.1987)).

Indiana's laws to correct petroleum contamination from leaking USTs are similar to the provisions of the federal Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 to § 9675, de-

signed to clean up hazardous substances. The UST laws were enacted in Indiana to fill a remediation gap in CERCLA created by its omission of petroleum as a "hazardous substance." *The Pantry,* 777 F.Supp. at 720. The UST laws were "drafted in the same language and spirit" as CERCLA and "follow the same remedial principles established by CERCLA." *Western Ohio Pizza, Inc. v. Clark Oil & Refining Corp.,* 704 N.E.2d 1086, 1090 (Ind.Ct.App. 1999), *trans. denied; see also The Pantry,* 777 F.Supp. at 720.

Federal courts have observed that Congress intended CERCLA to apply retroactively. *The Pantry,* 777 F.Supp. at 720. In *The Pantry,* Judge Tinder of the federal district court for the southern district of Indiana analyzed IC 13–7–20–21 and the 1991 amendment and found that, because these laws were modeled after CERCLA, both the statute and its amendment should apply retroactively to allow a voluntary clean-up, after June 30, 1991, of environmental releases that occurred prior to both laws' enactment. *Id.* at 720–21. To do otherwise, the court concluded, would "diminish the effectiveness of the remedial scheme established by environmental laws." *Id.* at 721. The court thus found a strong and compelling reason to apply the amendment retroactively to promote clean up of contaminated sites.

The retroactive application of the amendment was limited, though. Judge Tinder interpreted the 1991 amendment to allow a person to voluntarily *clean up contamination* that occurred prior to the enactment of both laws and seek contribution but did not allow *recovery of response costs* if they were incurred prior to the effective date of the amendment.[8] *The Pantry,* 777 F.Supp. at 721; *see also Western Ohio Pizza,* 704 N.E.2d at 1092. The court reasoned that, "construing the amendment to allow recovery of pre-enactment response costs would not *promote*

---

**8.** Under the federal law the terms "respond" or "response" mean remove, removal, reme- dy, and remedial action. 42 U.S.C. § 9601.

any future environmental clean-up, because the clean-up producing the pre-enactment costs would have been performed." *The Pantry,* 777 F.Supp. at 721.

In disallowing the retroactive application of the 1991 amendment, *The Pantry* court analyzed only the voluntary remediation prong of the amendment. *The Pantry* reasoning is equally applicable, though, to the fault portion of the amendment. The 1991 amendment was enacted to encourage private parties to remediate environmental hazards voluntarily. "This purpose is not served by allowing a party who had previously incurred response costs to seek contribution against a prior owner." *The Pantry,* 777 F.Supp. at 721. The remedial scheme of the UST laws is not affected by preventing the recovery of remediation costs incurred before the amendment.

■ There is no indication of legislative intent or strong or compelling reason to apply the 1991 amendment retroactively to the facts of this case. We therefore hold that the 1991 amendment to IC 13–7–20–21 applies retroactively only for the purpose of allowing a person to take action that remediates the contamination of a site contaminated by a pre-enactment release and seek contribution, but does not allow the recovery of response costs incurred prior to the effective date of the amendment.

Mini–Mart and Wanemacher refused IDEM's 1990 requests to take corrective action on the petroleum contamination of the Homeowners' residences. *Record* at 30, 1085. On April 28, 1990, IDEM took corrective action by installing a groundwater treatment system. The initial remediation cost IDEM $160,000. These response costs were incurred prior to the July 1, 1991 effective date of the amendment, therefore, Mini–Mart and Wanemacher's claim to recover the $160,000 in response costs is controlled by the pre-amended UST laws. The pre-amended laws allow recovery of costs only if Mini–Mart and Wanemacher can prove that Gast is the sole cause of the contamination.

As stated above, the verdict in the Homeowners' suit, holding Mini–Mart and Wanemacher liable for the petroleum release, prevents such a finding. As such, Mini–Mart and Wanemacher are precluded from suing Gast to recover the $160,000 in response costs incurred before July 1, 1991. The trial court's grant of summary judgment in favor of Gast on this issue is affirmed.

### III. Statute of Limitations

■ Remaining for our review is Mini–Mart and Wanemacher's claim for indemnification of ongoing remediation costs incurred after July 1, 1991. Gast alleges that the recovery of these costs is barred by IC 34–11–2–7, which provides that "actions for injuries to property other than personal property" must be commenced within six years after the cause of action accrues. Gast asserts that the underlying nature of the third-party action is damage to real property, namely petroleum contamination, and that Mini–Mart and Wanemacher are barred from recovering in 1997 for damage to real property that accrued in 1990. By contrast, Mini–Mart and Wanemacher argue that the cause of action is governed by IC 34–11–1–2, which provides that a cause of action that "(1) arises on or after September 1, 1982; and (2) is not limited by any other statute;" must be brought within ten years.

■ We agree with Mini–Mart and Wanemacher that the ten-year statute of limitations applies. The applicable statute of limitations is determined by the "nature or substance of the cause of action." *Klineman, Rose & Wolf, P.C. v. North American Lab. Co.,* 656 N.E.2d 1206, 1207 (Ind.Ct.App.1995), *trans. denied* (1996); *Monsanto Co. v. Miller,* 455 N.E.2d 392, 394 (Ind.Ct.App.1983). Mini–Mart and Wanemacher's suit against Gast was filed under IC 13–23–13–8 as amended (the successor to IC 13–7–20–21). Mini–Mart and Wanemacher are suing, not to recover for damages to their own property, but, instead, to allocate liability for the funds

spent by IDEM to clean up the environmental contamination of the Homeowners' property. The nature or substance of their claim sounds in contribution or indemnity, and the general ten-year statute of limitations found at IC 34-11-1-2 applies.[9]

In March 1990, all parties were aware of the release of petroleum. Mini-Mart and Wanemacher's third-party complaint was filed in December of 1997. Under the ten-year statute of limitations, the complaint was timely filed.

 On remand, the trial court will have to determine whether Gast has any liability for the release that caused the contamination that IDEM incurred costs in remediating. IC 13-23-13-8 allows a person who pays remediation costs or voluntarily undertakes corrective action to "receive a contribution from a person who owned or operated the underground storage tank at the time the release occurred." To be liable for any of the remediation costs incurred after July 1, 1991, Gast would have to have been an "operator" at the time the leak occurred. IC 13-11-2-148 defines "operator," for purposes of IC 13-23, to mean "a person (1) in control of; or (2) having responsibility for; the daily operations of an underground storage tank." The proper definition of "operator" under the UST laws is a question of law.

*Meyer*, 705 N.E.2d at 976, 979. The determination of who had responsibility for the daily operation of the tanks turns on "(1) what constituted the daily operation of the tanks, (2) who did these things, (3) in what capacity that person was acting and (4) who is responsible for that person's actions in that capacity." *Id.* at 977.

 Although the definition of "operator" is a question of law, "[t]he resolution of what the daily operations of the tanks are and who did them are related and highly fact sensitive inquiries." *Meyer*, 705 N.E.2d at 979. The trial court made no findings of fact or conclusions of law on the issue of "operator" specifically stating that it "does not address the issue relating to Gast's status" *Record* at 1750; *Appellants' Appendix* at 4. The designated evidence does not permit us to determine what activities were associated with the daily operation of Mini-Mart's USTs for the time Gast was involved. Nor can we determine who performed those activities and in what capacity. We therefore remand to the trial court the issues of whether Gast was an "operator" at the time of the release complained of by IDEM, and what, if any, liability Gast has to Mini-Mart and Wanemacher for remediation costs incurred by IDEM after July 1, 1991.

---

**9.** Because we hold that a ten-year statute of limitations applies, we do not reach the issue of when the limitations period commences to run. An obligation to indemnify or for contribution does not arise until the party seeking such remedy suffers loss or damages, *i.e.* at the time of payment of the underlying claim, payment of a judgment on the underlying claim, or payment in settlement of the underlying claim. *Essex Group, Inc. v. Nill*, 594 N.E.2d 503, 507 (Ind.Ct.App.1992); *see TLB Plastics Corp. v. Procter & Gamble Paper Products Co.*, 542 N.E.2d 1373, 1376 (Ind.Ct.App. 1989), *trans. dismissed* (obligation to indemnify arises after one seeking indemnity suffers loss or damages); *Estate of Leinbach v. Leinbach*, 486 N.E.2d 2, 5 (Ind.Ct.App.1985) ("to be entitled to contribution, the widow [claimant] must have first paid the debt or more than her proportionate share thereof");

*McLochlin v. Miller*, 139 Ind.App. 443, 448, 217 N.E.2d 50, 53, (1966) ("payment must be paid under compulsion to entitle payor to contribution"). T.R. 14 "permits a claim for indemnity to be litigated contemporaneously with the injured party's claim, but the rule in no way suggests that the obligation to indemnify arises before the indemnity claimant suffers loss." *TLB Plastics Corp.*, 542 N.E.2d at 1376.

Mini-Mart and Wanemacher have not paid IDEM for the remediation costs. On November 30, 1999, the trial court granted IDEM's motion for partial summary judgment concluding that Mini-Mart and Wanemacher were estopped from denying liability for the contamination. On the Record before us, it appears that the earliest date from which the statute of limitations could run is November 30, 1999.

Affirmed in part, reversed in part, and remanded.

FRIEDLANDER and DARDEN, JJ., concur.