**BOURBON MINI–MART, INC. and Robert E. Wanemacher, Appellants,**

v.

**GAST FUEL AND SERVICES, INC., and Jack Boardman, d/b/a Boardman Chevrolet, Appellees.**

No. 50S03–0106–CV–287.

Supreme Court of Indiana.

Feb. 14, 2003.

Patricia Polis McCrory, Angela L. Hamm, Lisa Tuytschaevers, Harrison & Moberly, LLP, Indianapolis, IN, Attorney for Appellant.

Donald G. Orzeske, Andrew S. Peacock, Goodin, Orzeske & Stevens, P.C., Indianapolis, IN, Attorneys for Appellee.

SULLIVAN, Justice.

Bourbon Mini–Mart seeks indemnification for and contribution to its costs of cleaning up petroleum contamination from leaking underground storage tanks from one of its suppliers and an automobile dealership. Because Mini–Mart was found at least partially responsible for the contamination in prior litigation, it is not entitled to indemnification. However, Indiana's underground storage tank legislation authorizes Mini–Mart to seek contribution from its supplier under the facts of this case.

### Background

The principal actors in this decade-old environmental drama are: Bourbon Mini–Mart, a gas station and convenience store, and its owner, Robert Wanemacher (collectively, "Mini–Mart"); Gast Fuel and Services, Inc., Mini–Mart's sole supplier of gasoline and other petroleum products ("Supplier"); Boardman Chevrolet, an automobile dealership near Mini–Mart that stores gasoline, oil, and other chemicals removed from motor vehicles in an underground storage tank ("Dealership"); the Workmans and the Duffs, two families whose homes were adjacent to Mini–Mart (the "Homeowners"); and the Indiana Department of Environmental management ("IDEM"). Mini–Mart stored gasoline in underground storage tanks ("USTs"). In 1990, the Homeowners complained to IDEM of fumes in their homes. After an investigation, IDEM found that the land, groundwater, and homes adjacent to Mini–Mart were contaminated with solvents including petroleum. Concluding that the petroleum contamination originated from Mini–Mart, IDEM informed Mini–Mart of the contamination and indicated that IDEM would clean up the site and attempt to recover its costs from Mini–Mart unless Mini–Mart acted on its own.

After Mini–Mart failed to initiate clean up of the contamination, IDEM began to clean up the site. The case that is the subject of this appeal began on June, 28, 1991, when IDEM sued Mini–Mart for reimbursement for its remediation expenses. (We will refer to this case from time to

time in this opinion as the "IDEM Litigation" to distinguish it from the "Homeowner Litigation" described below.) In December, 1997, Mini–Mart filed a third party complaint against Supplier, and amended the complaint in January, 1999, to add Dealership. The third party complaint alleged that Supplier and Dealership caused the contamination and sought payment from them for any sums that IDEM recovered from Mini–Mart for IDEM's remediation expenses.

During the time between the commencement of IDEM's case against Mini–Mart and the addition of Supplier and Dealership in Mini–Mart's third party complaints, the Homeowners sued Mini–Mart for nuisance, trespass, and negligence alleging Mini–Mart caused the contamination (the "Homeowner Litigation"). The Homeowner Litigation was a completely separate lawsuit from the IDEM Litigation and Mini–Mart did not attempt any cross-claim against the Supplier or Dealership in that case. The Homeowner Litigation concluded in 1996 when a jury found Mini–Mart liable and awarded the Homeowners $530,000.

The rulings in the IDEM Litigation that are the subject of this appeal were issued in November, 1999, when the trial court granted summary judgment in favor of Supplier and Dealership. In December, 2000, the Court of Appeals affirmed in part and reversed in part. *Commissioner, Ind. Dep't of Envtl. Mgt. v. Bourbon Mini–Mart,* 741 N.E.2d 361 (Ind.Ct.App.2000). As to Supplier, the Court of Appeals found that summary judgment in its favor was

proper with respect to remediation costs incurred prior to July 1, 1991, but not after that date. *Id.* at 371–372. As to Dealership, the Court of Appeals affirmed the grant of summary judgment in its favor. *Id.* at 369. Both Mini–Mart and Supplier sought and this Court granted transfer. *Commissioner, Ind. Dep't of Envtl. Mgt. v. Bourbon Mini–Mart,* 753 N.E.2d 17 (Ind. 2001) (table).

### Discussion

Briefly stated, this appeal requires that we decide whether Mini–Mart is entitled to proceed to trial against either or both of Supplier and Dealership based on Mini–Mart's claims that they caused in whole or in part the petroleum contamination described in *Background, supra.* The trial court held that Mini–Mart's claims against both Supplier and Dealership were barred by application of the doctrine of collateral estoppel and by the statute of limitations for damage to real property. It also held that Mini–Mart's claim against Dealership was additionally barred by application of the doctrine of laches.

As mentioned in *Background, supra,* the Court of Appeals affirmed in part and reversed in part.

First, it affirmed the trial court's ruling that Mini–Mart's claim against Dealership was barred by application of the doctrine of collateral estoppel.[1] *Bourbon Mini–Mart,* 741 N.E.2d at 369. On this issue, we summarily affirm the opinion of the Court of Appeals pursuant to Indiana Appellate Rule 58(A).[2]

---

1. Having affirmed the trial court's summary judgment in favor of Dealership on the basis of collateral estoppel, it was unnecessary to and the Court of Appeals did not address whether Dealership was entitled to summary judgment by application of the statute of limitations for damage to real property or doctrine of laches.

2. We note in this regard that Dealership's position differs from that of Supplier in that Mini–Mart sought both indemnification and statutory contribution from Supplier but only indemnification from Dealership. *Compare* Third–Party Pl.'s Am. Third–Party Compl. ¶¶ 9 & 10, R. at 690–91, with ¶ 15, R. at 691. For the reason discussed *infra,* collateral estoppel

Second, it reversed the trial court's ruling that Mini–Mart's claims against Supplier were subject to the statute of limitations for damage to real property, Ind. Code § 34–11–2–7. *Bourbon Mini–Mart*, 741 N.E.2d at 371–72. On this issue, we also summarily affirm the opinion of the Court of Appeals pursuant to Indiana Appellate Rule 58(A).

Third, it affirmed the trial court's ruling that Mini–Mart's claim against Supplier with respect to remediation costs incurred prior to July 1, 1991, was barred by the statute of limitations, but held that Mini–Mart's claims against Supplier with respect to remediation costs incurred after that date could proceed. *Bourbon Mini–Mart*, 741 N.E.2d at 369–71. We conclude, however, that Mini–Mart may proceed against Supplier with respect to remediation costs incurred both prior to July 1, 1991, and after.

I

We mentioned in *Background, supra*, that Mini–Mart had been found in the Homeowner Litigation to be liable for the petroleum contamination at issue here. "Collateral estoppel or issue preclusion bars subsequent litigation of an issue necessarily adjudicated in a former suit if the same issue is presented in the subsequent suit." *See Shell Oil Company v. Meyer*, 705 N.E.2d 962, 968 (Ind.1998). In the litigation between the Homeowners and Mini–Mart, the jury found Mini–Mart liable for negligence, nuisance, and trespass.[3] While Mini–Mart argues to the contrary, we agree with the trial court[4] and the Court of Appeals[5] that the jury's determination established that Mini–Mart was not without fault with respect to the petroleum contamination and that collateral estoppel bars re-litigation of that issue in this case.

As noted briefly in footnote 2, *supra*, Mini–Mart sought recovery from Supplier on two separate theories—indemnification and statutory contribution. The indemnification claim seeks payment from Supplier on the basis that the petroleum contamination was the sole fault of Supplier and others, *i.e.*, Mini–Mart itself was without fault. *See* Third–Party Pl.'s Am. Third–Party Compl. ¶ 9, R. at 690–91. Indeed, Indiana law provides that in an action for indemnification, the party seeking indemnification will only prevail if it is without fault. *Indianapolis Power & Light Co. v. Brad Snodgrass, Inc.*, 578 N.E.2d 669, 671 (Ind.1991). For Mini–Mart to avoid summary judgment on its indemnification claim, there would need to be a genuine issue of material fact that it was not liable for any of the petroleum contamination. We agree with the trial

bars Mini–Mart from seeking indemnification from either Supplier or Dealership.

3. Homeowners also named Supplier as a defendant, but Supplier settled out. Mini–Mart asserted no cross-claims or non-party defense claims.

4. "We don't know exactly what the jury found in that case because the verdict was a general verdict. They had to have found, however, that the gasoline that was causing their problems came from the Mini–Mart. Because of that, the Court believes that this issue can be the subject of [a] collateral estoppel ruling.... Litigating it again, under all of the circumstances described here, simply doesn't make sense." Order Upon Pending Mots. Including Summ. J. Mots. (R. at 1753; 1755.)

5. "In the Homeowners suit, Mini–Mart [was] sued for negligence, trespass, and nuisance because of the petroleum and vapors found in and around the Homeowners' homes .... jury found Mini–Mart ... liable for the contamination of the Homeowners' property. Under the doctrine of collateral estoppel, Mini–Mart [is] precluded from asserting that [it was] without fault in the contamination." 741 N.E.2d at 369. Mini–Mart does not suggest that any theory of no-fault liability was asserted against it.

court and Court of Appeals that Mini–Mart cannot make such a showing because its liability for at least some contamination was established in the Homeowner Litigation. Subsequent re-litigation of the issue is barred by collateral estoppel.

■ However, collateral estoppel does not dispose of Mini–Mart's statutory contribution claim against Supplier. Under applicable environmental statutes to be discussed in detail *infra,* a party held liable for environmental contamination can seek contribution from others partially liable for the same contamination in certain circumstances. We agree with the Court of Appeals and Mini–Mart that the verdict in the Homeowner Litigation, while establishing for purposes of collateral estoppel that Mini–Mart was not without fault with respect to the petroleum contamination, did not establish that Mini–Mart was solely responsible therefor.

While collateral estoppel does not bar Mini–Mart from seeking contribution from Supplier, it remains to be seen whether applicable law permits it to do so. It is to that question we now turn.[6]

## II

### A

Indiana's UST laws are modeled after the federal Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 to § 9675. Federal CERCLA law is directed at the cleanup of certain hazardous substances but excludes petroleum. To deal with the cleanup of petroleum, Indiana's Legislature enacted UST laws to provide for the regulation of underground storage tanks and the prevention and remediation of pollution from the tanks. As our Court has previously noted, the provisions of Indiana's UST laws are similar to corresponding provisions of federal CERCLA law, *see Shell Oil Co. v. Meyer,* 705 N.E.2d 962, 967 (Ind.1998), and they follow the same remedial principles. *See Western Ohio Pizza, Inc. v. Clark Oil & Refining Corp.,* 704 N.E.2d 1086, 1090 (Ind.Ct.App. 1999), *transfer denied,* 714 N.E.2d 176 (table); *The Pantry, Inc. v. Stop–N–Go Foods, Inc.,* 777 F.Supp. 713, 720 (S.D.Ind. 1991).

CERCLA authorizes the federal government to clean up hazardous substances and then seek reimbursement from responsible parties. 42 U.S.C. § 9607. This section of CERCLA also provides certain defenses that bar the government from seeking reimbursement: "There shall be no liability . . . for a person . . . who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by: (1) an act of God; (2) an act of war; (3) an act or omission of a third party. . . ." 42 U.S.C. § 9607(b).

The remedial section of Indiana's UST laws also encourages cleanup of contaminated sites by authorizing the State to seek reimbursement for its clean-up costs. Similar to the federal CERCLA statute, Indiana's UST statute exempts certain parties from liability. At issue in this appeal is which of two versions of Indiana's statute governs the IDEM Litigation.

---

**6.** The question here is unusual because a separate action for contribution has become rare. The Comparative Fault Act provides that damages are to be apportioned among responsible parties and the allocation of damages also accounts for nonparties where a defendant successfully asserts a nonparty defense. *See* I.C. § 34–51–2–14 (1998); *Owens Corning v. Cobb,* 754 N.E.2d 905, 911 (Ind. 2001). The issue of each party's liability is therefore determined in one action. Here, however, a special environmental statute, Ind. Code § 13–7–20–21, provides a right to a separate contribution action.

As originally enacted effective April 16, 1987, Ind.Code § 13-7-20-21 stated:

(a) Except where an owner or operator can prove that a release from an underground storage tank was caused *solely by:* (1) an act of God; (2) an act of war; (3) negligence on the part of the state or the United States government; (4) *an act or omission of a third party;* or (5) any combination of the causes set forth in subdivisions (1) through (4); the owner or operator of an underground storage tank is liable to the state for the actual costs of any corrective action. . . .

(b) Notwithstanding subsection (a)(4), if the owner or operator of an underground storage tank alleges that a release from the tank was caused solely by an act or omission of a third party, the owner or operator shall pay to the state the amount of the costs described in subsection (a). The owner or operator is entitled by subrogation to all rights of the state to recover from the third party the amount of the costs described in subsection (a) and paid to the state or incurred by the owner or operator in an action brought in the circuit or superior court of the county in which the release occurred.

Ind.Code § 13-7-20-21(b) (1988)[7] (emphases added). We will refer to this provision as the "Original Statute." Under it, the State was authorized to clean up a contaminated site and then obtain reimbursement for the remediation costs. And it provided a subrogation right to an owner or operator of a contaminated site that could prove that the contamination was caused solely by another party. An owner or operator not at fault would still be required to reimburse the State but could then seek reimbursement from the responsible third party. This subrogation right, however, was only available to owners and operators that could prove that the contamination was caused *solely by* the act or omission of a third party.

As noted *supra,* the IDEM Litigation was commenced by IDEM filing suit against Mini-Mart on June 28, 1991. Three days later, on July 1, 1991, Ind. Acts 129, § 8, took effect. It amended the Original Statute to read as follows:

(a) Except where an owner or operator can prove that a release from an underground storage tank was caused solely by: (1) an act of God; (2) an act of war; (3) negligence on the part of the state or the United States government; or (4) any combination of the causes set forth in subdivisions (1) through (3); the owner or operator of an underground storage tank is liable to the state for the actual costs of any corrective action. . . .

(b) A person who: (1) pays to the state the costs described under subsection (a); or (2) undertakes corrective action resulting from a release from an underground storage tank, regardless of whether the corrective action is undertaken voluntarily or under an order issued under section 19 or 26 of this chapter; shall receive a contribution from a person who owned or operated the underground storage tank at the time the release occurred. . . .

Ind.Code § 13-7-20-21 (1991). We will refer to this provision as the "Amended Statute."

We note two aspects of the Amended Statute. First, the amendment allowed a party to clean up a site voluntarily and then seek reimbursement for the cost of

---

7. These subsections were first enacted in 1987. 1987 Ind, Acts 172 § 1, eff. Apr. 16, 1987. They were amended the following year to read as set forth here. 1988 Acts 69, § 15, eff. Apr. 1, 1988. The 1988 amendments were not substantive for purposes of this litigation.

the corrective action. The original statute referred only to the state taking corrective action or ordering the owner or operator to do so.

Second, of central importance here, the amendment allowed a party that reimburses the State or voluntarily undertakes corrective action to seek contribution from any other owner or operator regardless of the latter's degree of fault. Under the Original Statute, an owner or operator forced to reimburse the State for remediation costs was entitled to recover from a third party *only* if the third party was *solely* liable for the contamination. The crucial distinction is that under the Amended Statute, an owner or operator that paid remediation costs to the State was no longer required to be completely without fault in order to obtain reimbursement from a third party, *i.e.*, to receive reimbursement for response costs paid, the law no longer required the contamination be caused *solely by* a third party.

### B

This case presents two issues regarding the retroactive application of Indiana's UST laws. First, do the remedial provisions of Indiana's UST laws in general and the Amended Statute in particular apply to contamination that occurred prior to its enactment? Second, is a party such as Mini–Mart entitled to use the contribution provisions of the Amended Statute to recover from third parties clean-up costs that were incurred prior to the amendment?

### B–1

The general rule is that unless there are strong and compelling reasons, statutes will not be applied retroactively. *Martin v. State,* 774 N.E.2d 43, 44 (Ind. 2002) (citing *Metro Holding Co. v. Mitchell,* 589 N.E.2d 217, 219 (Ind.1992)); *Indiana Dep't of Envtl. Mgmt. v. Medical Disposal Serv., Inc.,* 729 N.E.2d 577, 581

(Ind.2000); *Chadwick v. City of Crawfordsville,* 216 Ind. 399, 413–14, 24 N.E.2d 937, 944 (1940). An exception to this general rule exists for remedial statutes, *i.e.* statutes intended to cure a defect or mischief that existed in a prior statute. *Martin,* 774 N.E.2d at 44 (citing *Bryarly v. State,* 232 Ind. 47, 111 N.E.2d 277, 278–79 (1953)); *Ind. Dep't of State Revenue v. Estate of Riggs,* 735 N.E.2d 340, 344 (Ind. Tax Ct.2000). Ultimately, however, whether or not a statute applies retroactively depends on the Legislature's intent. That is, when a remedial statute is involved, a court must construe it to "effect the evident purpose for which it was enacted[.]" *Martin,* 774 N.E.2d at 44 (citing *Connecticut Mut. Life Ins. Co. v. Talbot,* 113 Ind. 373, 14 N.E. 586, 589 (1887)). Accordingly, remedial statutes will be applied retroactively to carry out their legislative purpose unless to do so violates a vested right or constitutional guaranty. *Martin,* 774 N.E.2d at 44.

As we have stated, the corrective action provisions of Indiana's UST laws are similar to corresponding provisions of federal CERCLA law and follow the same remedial principles. It is well established that CERCLA applies to releases that occurred prior to its enactment. Even though there is no language in CERCLA that explicitly provides that it operates retrospectively, it has been understood to apply to emissions of hazardous waste that predated CERCLA's enactment. *See United States v. Northeastern Pharm.· & Chem. Co., Inc.,* 810 F.2d 726, 732–33 (8th Cir.1986) ("Although CERCLA does not expressly provide for retroactivity, it is manifestly clear that Congress intended CERCLA to have retroactive effect."); *The Pantry,* 777 F.Supp. at 720 ("Although CERCLA provisions contain no explicit statement providing retroactive application, it is clearly the rule in federal courts that congress

intended CERCLA to apply retroactively."). The Eighth Circuit found CERCLA's "statutory scheme itself [to be] overwhelmingly remedial and retroactive." *Northeastern Pharm. & Chem. Co., Inc.,* 810 F.2d at 733.

■ Following this precedent, the U.S. District Court for the Southern District of Indiana and the Indiana Court of Appeals have both held that Indiana's UST statute, including the Amended Statute, should be applied retroactively to contamination that occurred prior to enactment. *See The Pantry,* 777 F.Supp. at 721 ("Whether the clean-up is initiated by the state or a private party, the UST laws apply retroactively to releases occurring prior to the effective date of the statute or the amendment, respectively."); *Bourbon Mini–Mart,* 741 N.E.2d at 370. We agree.

### B–2

The question that remains is whether the Amended Statute also applies to pre-enactment response costs. That is, may Mini Mart seek contribution from Supplier for payments Mini–Mart made to IDEM for cleanup where those payments were made prior to the enactment of the amendment? The Court of Appeals held that Mini–Mart could not. In its decision, the court relied on *The Pantry,* in which the federal court held that the Legislature intended to limit recovery to response costs that were incurred after its enactment.

The federal court reasoned that the purpose of the Amended Statute "was to encourage private parties to remediate environmental hazards voluntarily." It found that this limited purpose was not served by construing the Amended Statute to allow recovery of pre-enactment response costs. *The Pantry,* 777 F.Supp. at 721. "Instead of promoting environmental clean-up," the court reasoned that "such a construction would merely provide a windfall recovery for parties who voluntarily effected remediation prior to the amendment." *Id.*

In summary, the federal court in *The Pantry* and the Court of Appeals in this case both held that the Amended Statute applies retroactively for the purpose of allowing an owner or organizer to obtain contribution from responsible owners and operators for the costs of remediating pre-enactment environmental contamination so long as those costs were not incurred prior to the effective date of the Amended Statute. As such, the Court of Appeals allowed Mini–Mart to seek contribution from Supplier for the cost of remediating the petroleum contamination, even contamination that occurred prior to the effective date of the Amended Statute. However, the Court of Appeals did not permit Mini–Mart to seek contribution from Supplier for such cost incurred prior to the effective date of the Amended Statute.

■ We disagree with the federal court and the Court of Appeals and hold instead that the Legislature intended that an owner or operator be able to seek contribution from responsible owners and operators for the costs of remediation incurred prior to the effective date of the Amended Statute.

The Original Statute contained no explicit reference to voluntary remediation on the part of an owner or operator of an UST. The Original Statute seems to contemplate that either IDEM would take "corrective action" itself or order the owner or operator to do so. *See* Ind.Code § 13–7–20–21(a) (1988). As discussed *supra,* one of the changes brought about by the Amended Statute was an explicit recognition than an owner or operator might voluntarily undertaken corrective action. *See* Ind.Code § 13–7–20–21(b)(2) (1991). Finding that the Legislature's sole intent in adopting the Amended Statute was to

encourage voluntary corrective action, the federal court in *The Pantry* case found no support for the proposition that the Legislature also intended that an owner or operator be entitled to expanded (*i.e.*, retroactive) recovery rights. *See The Pantry,* 777 F.Supp. at 721.

There is no doubt that the Legislature intended to encourage owners and operators voluntarily to remediate contaminated sites. And we find, for three principal reasons, that the Legislature also intended the contribution provision to apply to pre-enactment response costs.

First, the language of the Amended Statute indicates that the Legislature intended to do more than just encourage voluntary remediation. The Original Statute allowed an owner or operator of an UST to recover from third parties amounts paid to the state or that the owner or operator itself incurred for corrective action where the environmental contamination "was caused solely by an act or omission of [the] third party." The Amended Statute allowed an owner or operator of an UST to recover from third parties amounts paid to the state or that the owner or operator itself incurred for corrective action (whether the corrective action was ordered by IDEM or undertaken voluntarily) from any "person who owned or operated the underground storage tank at the time the release occurred," not just those solely responsible for the contamination. Thus, while the Amended Statute expanded the class of corrective action for which owners and operators could seek recovery to include the costs of voluntary remediation, it also expanded the class of third persons from whom recovery could be sought.

If the sole purpose of the Amended Statute was to encourage voluntary action, it would have been unnecessary for the Legislature to expand the class of third per-

sons from whom recovery could be sought. Nevertheless, the Legislature expanded the class of third persons from whom recovery could be sought from those solely responsible for the contamination to include any other person who owned or operated an UST at the time the release occurred. While this by itself does not demonstrate that the Legislature meant for recovery to be retroactive, we believe that it shows that the Legislature intended more than simply to encourage voluntary remediation.

Second, the Legislature enacted the Amended Statute's contribution provision against the backdrop of the general retrospective application of federal CERCLA law and Indiana's UST laws. As previously discussed, the federal CERCLA and Indiana's UST laws have generally been held to reach back into the past to address contamination by responsible parties. The remedial powers of CERCLA have been understood to be broad, and the statute is generally said to embody principles of equity. *See United States v. Alcan Aluminum Corp.,* 990 F.2d 711, 724 (2nd Cir. 1993) (citing *O'Neil v. Picillo,* 883 F.2d 176 (1st Cir.1989)); *United States v. Conservation Chem. Co.,* 628 F.Supp. 391, 401–02 (W.D.Mo.1985) ("... the Court reads the legislative history of CERCLA to impose upon the judiciary an obligation to apportion responsibility in a fair and equitable manner."). We believe it more consistent with this general retroactive philosophy to hold that the Amended Statute applies to both pre-enactment environmental contamination and pre-enactment incurred remediation costs rather than to only the former.

Third, because Indiana's UST laws follow the general scheme of federal CERCLA laws, it is useful to consider contribution in the federal context. The treatment of contribution in federal CERCLA legislation also suggests that pre-enactment re-

sponse costs are intended to fall within the reach of the statute. The original CERCLA legislation, like our original UST laws, did not mention "contribution." Federal courts, however, found a right to contribution in CERLA. In 1985, the District Court for the Western District of Missouri applied principles of contribution to CERCLA even though the legislation did not mention contribution as a possible remedy. *See Conservation Chem. Co.*, 628 F.Supp. 391. In that CERCLA action, the District Court employed contribution as it was applied in the 1977 Uniform Comparative Fault Act. It stated, "contribution is a remedy that developed in equity and . . . the Court reads the legislative history of CERCLA to impose upon the judiciary an obligation to apportion responsibility in a fair and equitable manner." *Conservation Chem. Co.*, 628 F.Supp. at 401.

In 1986, Congress amended CERCLA, explicitly allowing for contribution. 42 U.S.C. 9613(f)(1) states: "Any person may seek contribution from any other person who is liable or potentially liable. . . . In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." In enacting the amendment, Congress acknowledged that contribution had already been a recognized remedy under CERCLA:

> It has been held that, when joint and several liability is imposed under section 106 or 107 of the Act, a concomitant right of contribution exists under CERCLA. . . . This section *clarifies and confirms the right of a person held jointly and severally liable under CERCLA to seek contribution* from other potentially liable parties, when the person believes that it has assumed a share of the cleanup or cost that may be greater than its equitable share under the circumstances.

*See* H.R.Rep no. 99–253(I), 99th Cong., 2d Sess. 79, reprinted in 1986 U.S.C.C.A.N. 2835, 2861 (citations omitted) (emphasis added).

In a case similar to ours, the Second Circuit Court of Appeals considered contribution as it applied before and after the 1986 amendment to CERCLA. In *United States v. Alcan Aluminum Corp.*, 990 F.2d 711 (2nd Cir.1993), the Court considered whether to apply contribution, as provided in the amendment, to pre-enactment response costs. The Court decided that it was not necessary to apply the 1986 amendment in order to allow for contribution. Instead the court found that contribution was a valid remedy under CERCLA even prior to 1986. *Alcan Aluminum Corp.*, 990 F.2d at 724.

We acknowledge that reasoning used in *Alcan* does not apply directly to the present case as this court has never considered whether contribution was a valid remedy under Indiana's UST laws prior to 1991. The Amended Statute, however, moved Indiana's UST laws even closer to federal CERCLA law. Indiana's amended UST statute, in similar language to 42 U.S.C. 9613(f)(1), states, "In resolving a contribution claim, a court may allocate the cost of a corrective action among the parties to the action using equitable factors that the court determines are appropriate." Ind. Code § 13–7–20–21 (1991). We believe that the Legislature's intent here is best achieved by allowing recovery of pre-enactment costs.

Given the equitable principles of CERCLA, the Legislature's use of contribution as a remedy, and the general retrospective nature of CERCLA, we find that the Legislature intended the amendment to apply to pre-enactment incurred response costs.

We hold that Mini–Mart is entitled to seek contribution under the Amended Statute from Supplier for Supplier's pro-

portionate share, if any, of the costs of corrective action paid or undertaken in connection with the petroleum contamination, irrespective of the date on which such costs were incurred. As such, Supplier was not entitled to summary judgment on this issue.

*Conclusion*

Having previously granted transfer pursuant to Ind. Appellate Rule 58(A), we summarily affirm the portions of the opinion of the Court of Appeals affirming the trial court's summary judgment in favor of the Dealership and holding Ind.Code § 34–11–1–2 to be the applicable statute of limitations in this case. We affirm the trial court's summary judgment in favor of Dealership, reverse its summary judgment in favor of Supplier, and remand to the trial court for further proceedings.

SHEPARD, C.J., and DICKSON, BOEHM, and RUCKER, JJ., concur.